Argued February 9; affirmed April 19, 1949

## DETSCH *v.* DETSCH

205 P. 2d 180

[ 1 ]

*S. J. Bischoff,* of Portland, argued the cause and filed a brief for appellant.

*Lester W. Humphreys,* of Portland, argued the cause for respondents. On the brief were Gilley, Humphreys & Sercombe, of Portland, for Respondent Edna E. Detsch, Executrix of the Estate of Arthur S. Detsch, Deceased, and Caldwell & Roehr, of Portland, for Respondent The United States National Bank of Portland.

Before LUSK, Chief Justice, and BRAND, BELT, ROSS-MAN, KELLY and BAILEY, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff, A. Jackson Detsch, from a decree of the Circuit Court, based upon findings of fact and conclusions at law, which dismissed his complaint. The defendants-respondents are Arthur

S. Detsch, brother of the plaintiff-appellant, and the United States National Bank of Portland. The subject matter of the suit is some securities worth $35,000 which Sarah T. Detsch, mother of the two aforementioned men, lodged with the United States National Bank September 15, 1944. More specifically, the subject matter of the suit is a declaration of trust which Mrs. Detsch executed September 15, 1944, and an instrument amendatory thereof which she signed February 1, 1945. Briefly stated, the instrument of September 15, 1944, conveyed the securities to the bank in trust; it directed the bank to pay the trustor such amounts, whether of income or principal, as were necessary for her support; it provided that upon her death the trustee should distribute the residue "to the trustor's two sons, A. Jackson Detsch and Arthur S. Detsch, in equal shares"; and reserved the right to the trustor to terminate or amend the trust instrument. The document of February 1, 1945, amended the declaration of trust so as to require the trustee to "distribute the residue of said fund, including the principal, interest and net income, to the trustor's son, Arthur S. Detsch." It declared:

"I specifically omit to make any provision for my son, A. Jackson Detsch, for the reason that he has had vast sums of money from the family already, as his father spent thousands upon him due to trouble that my said son got into, and in addition thereto gave him large sums of money while my son, Arthur, has never received anything and has been such a good son to me. I therefore declare that he receive whatever I may leave."

Mrs. Detsch, the trustor, was born December 11, 1861, and was close to 83 years of age when she signed the declaration trust. She died August 15, 1946, a year and a half after she had signed the amendatory instrument, and one year and eleven months after her execu-

tion of the declaration of trust. She had been a widow since February 15, 1908.

The complaint alleged that both of the aforementioned instruments were invalid. It did not challenge the form, execution, attestation or meaning of either instrument, but averred that on September 15, 1944, when Mrs. Detsch made the declaration of trust, she lacked testamentary capacity, and that on February 1, 1945, when she signed the amendatory instrument, she not only lacked testamentary capacity but, in addition, was the victim of delusions, hallucinations and undue influence.

The appellant presents these assignments of error:

"The court below erred in holding that decedent had mental capacity to execute the amendment of the trust on February 1, 1945, and in refusing to hold that the amendment of the trust resulted from the insane delusion that decedent was abused at the household of the plaintiff."

"The court below erred in refusing to hold that the amendment of the trust was the joint product of a morbid delusion of abuse by plaintiff and fraudulent conduct amounting to undue influence on the part of Arthur and his wife."

Although the complaint averred that both trust instruments were invalid, it will be observed that the assignments of error are not concerned with the declaration of trust, but with the amendment of it and Mrs. Detsch's mental condition when it was signed. Notwithstanding the averment of the complaint, the plaintiff, as a witness, swore that he had no objection to the declaration of trust and that it had his approval. When the declaration of trust was executed September 15, 1944, Mrs. Detsch's home was in the Mallory Hotel, Portland. Two days later she departed for San Francisco and became a guest in the home of her son,

the appellant, A. Jackson Detsch. The latter resided in San Francisco and conducted a business there. Mrs. Detsch remained in her son's home until October 18, 1944, when she was taken to the home of Mrs. Sylvia Romaine. She stayed with Mrs. Romaine until November 3 when a fracture of one of her ankle bones caused her to be confined in Sutter Hospital, San Francisco. December 18, 1944, while a cast was still upon her foot, she was transferred, upon her own request, by plane to Good Samaritan Hospital, Portland. February 1, 1945, while she was in Good Samaritan Hospital, she signed the amendatory instrument. April 1, 1945, or shortly prior thereto, Mrs. Detsch was discharged from Good Samaritan Hospital and returned to the Mallory Hotel where she lived alone during the ensuing year. April 13, 1946, she entered Fairlawn Hospital, Portland, which accepts persons afflicted with nervous ailments. She died in that institution four months later.

As we said, A. Jackson Detsch lived in San Francisco. We shall hereafter refer to him as Jackson, or the appellant. His brother, the defendant-respondent, Arthur S. Detsch, resided in Seattle, but had a business in Portland. We shall refer to him as Arthur. Josephine, the wife of Jackson, and Edna, the wife of Arthur, received frequent mention at the trial. To facilitate convenience, we shall refer to them by first names and reserve the name, Mrs. Detsch, for the trustor and decedent. After the appeal was perfected Arthur died, and Edna, as executrix of his estate, was substituted in his place as a defendant.

Dissension existed between Arthur and Jackson. Their communications generally took place through the mails and wires. The mother manifested equal affection for each of her sons until shortly prior to

the first of October, 1944. She wrote each of them many endearing letters and occasionally visited them in their homes. She had no other children.

We shall now state the appellant's contentions. The statement will have to be intermingled with mention of some facts. As we said, Mrs. Detsch, up to October 1, 1944, or thereabouts, treated her two sons with equal affection. September 30, 1938, she executed a will which bequeathed the residue of her estate to "my two sons, A. Jackson Detsch, and Arthur S. Detsch, if they be living at the time of my death, in equal shares." June 14, 1944, that is, three months before she signed the aforementioned declaration of trust, she executed another will in which she devised her estate, apart from some minor bequests, "to my two sons, Arthur S. Detsch, and A. Jackson Detsch, share and share alike." September 15, 1944, she signed the declaration of trust which provided that upon her death "the trustee shall distribute the residue of said trust fund, including both principal and accrued net income, to the trustor's two sons, A. Jackson Detsch, and Arthur S. Detsch, in equal shares." The amendatory instrument of February 1, 1945, gave the entire estate to Arthur alone. It is the contention of the appellant that near the beginning of the four and one-half months which elapsed between the execution of the two documents last mentioned his mother suffered a mental breakdown and became the victim of delusions and hallucinations. He contends that the delusions and hallucinations made her feel that he was mistreating and imprisoning her.

The appellant's brief, referring to the will of June 14, 1944, says:

"Following the execution of that will, her physical and mental condition became very bad, creating an emergency which necessitated her removal from the Mallory Hotel where she was then living."

Jackson claims, as that statement indicates, that his mother's purported breakdown began to manifest itself shortly after June 14, 1944. A week or more prior to June 14, 1944, Mrs. Detsch came to Portland and took a room in the Mallory Hotel. From June 14, 1944, to September 17, 1944, she made her home in that hotel. September 17, 1944, she left Portland in the company of Josephine for her son's home in San Francisco. For the purpose of portraying the appellant's contentions, we again quote from his brief:

"The arrival of the decedent at the home of plaintiff on September 17 or 18 marks a turning point in the mental condition of the decedent and in the relationship between the decedent and plaintiff. Within a day or two after her arrival, decedent's mental condition deteriorated greatly and almost spontaneously. Her conduct and the conduct of plaintiff and his household toward her during the period of time from September 17th or 18th when she arrived to about November 4th will have to be examined to determine whether the transition from love to hatred was the result of mistreatment of decedent by plaintiff and his wife or whether it was the result of an insane delusion of mistreatment, persecution and imprisonment. This is the crucial period of time involved in this case, for it was during this period of time that the animosity toward Jackson was generated."

Thus it is seen that Jackson concedes that he lost his mother's affection shortly after she entered his home September 18. As the quoted language says, the problem is, did he lose her affections as the result of purported delusions which victimized her, or did he lose them through mistreatment of her. It will be observed that the appellant says that the period of September 18 to November 4 is "the crucial period of time." Although we shall devote much time to that period, the

material day is February 1, 1945, that being the day when the amendatory instrument was signed.

As we have indicated, Mrs. Detsch lived in her son's home from September 18, 1944, until October 18, 1944, when she went to the home of Mrs. Romaine. She remained in Mrs. Romaine's home until November 3, 1944. We now quote again from the appellant's brief:

"It is the contention of plaintiff that at the time decedent executed the amendment of trust, she was laboring under an insane delusion (monomania) that plaintiff and the members of his household had abused her after she went to live in plaintiff's home on September 18, 1944. There was no foundation in evidence for decedent's feeling of abuse.

"This delusion was generated spontaneously, almost immediately upon her arrival at the home of the plaintiff and his wife on September 18, 1944, or within a very few days, after, to such an extent that she was entirely unaware of the nature, character and effect of her own conduct and unable to comprehend that what plaintiff and the members of his household were attempting to do was for her welfare, happiness, safety and comfort, and not for the purpose of causing her distress and humiliation."

It is also the appellant's contention that Arthur resorted to undue influence in bringing about the amendatory instrument. His contentions in this regard claim that Arthur knew of the purported delusions and hallucinations to which his mother was subject but did nothing to disabuse her mind of them. It is also claimed that the signing of the amendatory instrument was made a matter of secrecy and that thereby the appellant was deprived of opportunity of showing his mother that he had not mistreated her. This completes our statement of the appellant's contentions.

The record is imposing. The testimony, as transcribed, covers more than 550 pages. In addition to it there are several hundred pages of depositions which were taken in Philadelphia and San Francisco. Adding to the bulk of the evidence are hundreds of letters, many of them written by hand, which became exhibits. Further, the record contains a large number of photographs showing, among other items, the rooms, furnishings and exterior features of Jackson's home. The letters cover the period from 1930 to and including 1945. Counsel for Jackson, out of consideration for this court, which is genuinely appreciated, had this mass of letters typed, arranged in chronological order and bound together in the form of a volume. Tabs which indicate years, fastened at appropriate places at the right-hand edge of the bulky mass, assist one in locating desired letters. We hope that this thoughtful ingenuity of appellant's counsel will be emulated in other cases. Possibly it is well to state that present counsel for the appellant did not represent him in the trial court and is not responsible for the evidence which we are about to review.

The instruments of September 15, 1944, and February 1, 1945 so far as this case is concerned, were testamentary in character. The fundamental principle which governs the issues before us is simple: It was necessary that the trustor possessed testamentary capacity when she signed those documents and that she was free from undue influence. Since both instruments were properly executed and attested, we are authorized to presume that Mrs. Detsch possessed testamentary capacity when she signed them. Obviously, every son and daughter whose relationship with their parents has not terminated has influence with them. If the will of mother or father contains a bequest or devise for him,

it is likely that the influence he possessed may have been a factor. But influence, to invalidate a bequest or a devise, must be undue; no influence is undue unless it substitutes itself for the purpose of the testator and deprives him of his free agency.

The foregoing principles are simple, and yet in their application such a mass of ancillary rules has developed that the entire growth resembles a banyan tree. The offshoots have become so numerous that they obscure the fundamental rule itself. An analysis of all the subservient rules and a determination of their application to the facts of a specific case has a tendency to divert the examination from the evidence. Normally, in cases such as the one before us, the main difficulty consists of getting at the facts. For present purposes at least, the foregoing simply stated legal principles will suffice.

At the time of the trial Jackson was 61 years of age and Arthur was 55. The two were born in Philadelphia where the father was engaged in business until the time of his demise in 1908. Although the evidence indicates that his estate was in a precarious condition when death overtook him, he appears to have been previously a man of substance. Besides conducting a meat business, he owned the majority of the stock of a corporation entitled E. C. Warner Company, which was engaged in a phase of the fish business. Following her husband's death, Mrs. Detsch placed some of the assets she received from his estate in trust with a bank in Philadelphia which bears the name of The Pennsylvania Company for Insurance on Lives and Granting Annuities. It managed the estate for her with marked business acumen and provided her with a good income. An officer of that company became the manager of the Warner Company which thereupon fared so

well that it became Mrs. Detsch's principal source of income.

In 1908 Jackson left Philadelphia and came to the Pacific Coast. Before long he established himself in business in San Francisco. A few years later Arthur moved to this coast and established a business similar to Jackson's in the cities of Portland and Seattle. Following her husband's death in 1908 Mrs. Detsch gave up her home and lived in hotels. She devoted much time to travel. We observe that she made a trip to Europe which took her to Greece and other Mediterranean countries. In later years she traveled to various places in the United States including many trips to Portland, Seattle and San Francisco. In 1938 she abandoned Philadelphia as her home and thereafter, apart from several visits to Seattle and San Francisco, lived in the Mallory Hotel in Portland.

Mrs. Detsch appears to have been a proud woman who was strong-willed and accustomed to having her own way. Although she was imperious by nature, she was just with those about her. She had marked religious convictions and as a young woman taught in the Sunday School of a Methodist Church. Later she embraced the Christian Science faith and sought the spiritual values as well as comfort of mind and health of body which it offers. Mrs. Detsch was inclined to be highstrung and given over to quick sensibilities. Jackson described her in these words: "Mother was always emotional, she would be given to outbursts; otherwise she was fairly normal." He made much use of the adjective "emotional" in describing her. Apart from the period we shall later mention, Mrs. Detsch always displayed affection for her sons and wrote them numerous endearing letters.

February 4, 1910, when Mrs. Detsch was 49 years

of age, she was placed as a private patient in Friends Hospital, Philadelphia, an institution for the treatment of mental disorders. An entry on the hospital records indicates that the cause of her condition was "grief and worry." It will be recalled that her husband died in 1908, that Jackson left Philadelphia in that year, and that Arthur was then 17 or 18 years of age. In 1907 Jackson was indicted and tried in Philadelphia for first degree murder. Shortly thereafter his wife, Josephine, sued him for divorce. The father bore the expense of those proceedings, and Arthur inferred that those expenses were the reason why the father's estate was threatened with insolvency. The hospital records recite:

"Loss of her husband and worry about investments gradually unsettled her mind. Has been sleeping poorly, is in an agitated state of melancholia, fears that they are coming to want and will not be able to get any food."

April 8, 1910, she escaped from Friends Hospital and went to the home of friends. She was not returned to the hospital nor to any similar place, and, so far as the evidence indicates, never again gave any indication of mental aberrations, unless the testimony presented by Jackson covering the period beginning with the summer of 1944, shows mental derangement. Shortly after her escape from Friends Hospital she entrusted her estate to the Pennsylvania Company in the manner already mentioned. It was after she took that course that her income became adequate and she made her European trip.

The above will suffice for present purposes as a narrative of the earlier years of Mrs. Detsch's activities. The skillful management by the Pennsylvania Company of her wealth provided her with an income

that gave her ease of mind and the means with which to travel. As we indicated, she left Philadelphia in 1938 and came to the Pacific Coast. Sometime in 1940 she took up her abode in the Mayflower Hotel, Seattle, and remained there until October, 1941. She then went to San Francisco where she spent a brief period in Jackson's home and a couple of weeks or so in a hotel. In February, 1942, she came to Portland where she remained until September. In the latter month she returned to Seattle, but by September, 1943, she was back in the Mallory Hotel in Portland. In December, 1943, she fractured a hip bone and came under the care of Dr. C. Elmer Carlson of Portland. In May, 1944, she went to Arthur's home for a six weeks' visit. By the middle of June, 1944, she had returned to the Mallory Hotel. We are now only three months from the period which the appellant terms "the crucial period."

August 2, 1944, Mrs. Detsch, while living in the Mallory Hotel, employed Miss Caroline Higley, a nurse. Miss Higley continued in her services until September 17, 1944, when Mrs. Detsch departed from Jackson's home in San Francisco. Miss Higley's hours were 9:00 a. m. to 5:00 p. m. Although Mrs. Detsch subscribed to the Christian Science faith, she, nevertheless, patronized medical practitioners, and her employment of a nurse was not a new experience for her. Miss Higley testified: "I was more a companion, I would say, than a nurse." Referring to Mrs. Detsch, she explained: "She complained very little about her health."

September 15, 1944, as we have already said, Mrs. Detsch signed the declaration of trust. Since Miss Higley entered Mrs. Detsch's employ August 2, 1944, and remained in it until September 17, she observed

the trustor daily during a period which is material to the issues of this case. Miss Higley had held responsible positions, and for many years had served as nurse and companion for elderly women. Her veracity and competency have not been questioned.

Frequently when Miss Higley reached the hotel a few minutes before nine in the morning Mrs. Detsch had bathed, dressed herself, and left a note for Miss Higley saying that she had gone for a walk or to the dining room for breakfast. Mrs. Detsch and Miss Higley spent the day in such diversions as conversation, walking, shopping and attending motion picture performances. Almost every day at noon Mrs. Detsch took Miss Higley to her favorite place for eating lunch. Miss Higley described Mrs. Detsch as a bright woman who "had a mind of her own" and who possessed "a memory that was good." At times she found Mrs. Detsch to be impatient and, due to her strong determination, she occasionally presented difficulties. She thought that the accumulating years were showing their mark and that in some respect Mrs. Detsch "was childish, as many old people are." She illustrated that observation with this example:

> "She wanted to be sure she looked nice. She would try on three or four hats before she would go to lunch and see which one looked the nicest. She wanted to be sure she looked nice before she went on the street. * * * She liked attention. I would introduce her to my friends and she was courteous and seemed to enjoy them."

Miss Higley testified that Mrs. Detsch was tired of hotel life and longed for the privacy of a home. It must be remembered that in 1944 hotels were crowded as a result of the unprecedented demands made upon them by war conditions. Both room accommodations and dining room service were below standard.

September 13 Josephine came to Portland and went at once to Mrs. Detsch's hotel. Mrs. Detsch shared her room with her daughter-in-law until the two departed for San Francisco four days later. We are now at the beginning of what the appellant deems the crucial period. It extended to November 3, 1944.

September 15, 1944, Mrs. Detsch, Josephine and Miss Higley went to the Trust Department of the United States National Bank (one of the two defendants) and there called upon Mr. E. C. Pierce, trust officer. At the bank they were joined by Arthur and his secretary, Miss Lillian H. Parsons. It was upon that occasion that Mrs. Detsch signed the declaration of trust which is one of the two instruments mentioned in the complaint. Josephine, Mr. Pierce, Miss Higley, Miss Parsons and Arthur were present when Mrs. Detsch signed the paper. It was prepared by the Trust Department, more particularly by the bank's attorneys.

In order to determine the true import of what occurred on September 15, when Mrs. Detsch signed the declaration of trust, it is necessary, not only to review the incidents that occurred at that hour, but to take notice of some developments that had their beginning about a month prior to September 15. As we have said, Mrs. Detsch's estate was lodged with a Philadelphia bank under a declaration of trust executed by her in 1910. For some time prior to September 15, 1944, she had planned to terminate the Philadelphia trust and transfer her possessions to a Portland trust company. On August 1, 1944, while she was in Seattle she wrote to Jackson:

"I am planning to remove my affairs from the Penna. Co. to United States National Bank in Portland so as to be near me. I expect to leave for Portland, Ore. tomorrow by air plane."

August 3, 1944, Arthur wrote to Jackson, saying:

"No doubt by this time you have received a card from Mother, advising you that she was returning to Portland Wednesday, August 2. * * * I am glad that you plan a trip to the Northwest where you can see Mother and discuss whatever might seem advisable for her future welfare. In this connection I might say, Jack, that there are matters to discuss, one of which I have written you about several times, and that is the change of managers of Mother's financial affairs. I believe Mother has written to you on this subject herself. * * *."

August 5, 1944, Jackson wrote to Arthur:

"Referring to your letter of August 3rd, I got a letter yesterday with a note in mother's handwriting simply stating that she was taking a plane to Portland and that she was transferring her affairs to the United States National Bank in Portland, Oregon.

"From my experience, it would seem desirable to have a change in the manner in which mother's affairs were handled, and while it may be that Portland would be as good a place as any, still I would like to have copies of correspondence which has gone on with the Pennsylvania Company regarding such a proposed change, * * *. You will remember stating over the telephone you would send me a copy of mother's proposed or executed new will, as requested also in my letter of previous date. * * *

"In the meantime I have written all my principals that I propose taking a trip through the Northwest and am awaiting their replies and comments. I shall bring Josephine with me as far at least as Portland * * *."

It is seen from the letter just quoted that Jackson wanted copies of all correspondence which had been exchanged with the Pennsylvania Company concerning a transfer of the trust, and also a copy of his mother's

will. It will likewise be observed that he contemplated making a trip to Portland. It is well to bear those matters in mind as we proceed. In view of the fact that several of Jackson's letters from which we shall quote mentioned his mother's will, it seems pertinent to take note of the fact that Mrs. Detsch's estate was her own. When her husband died he left no will and, following the probate of his estate, Jackson was given his part. June 14, 1944, Mrs. Detsch executed a will, the material parts of which are:

"Third: I give and bequeath to my son, Arthur S. Detsch, my ring with the three diamonds and the bracelet with the seven diamonds.

"Fourth: I give and bequeath to my son, A. Jackson Detsch, my diamond earrings, dinner ring and the brooch with four diamonds in it.

"Fifth: All the rest, residue and remainder of my estate, of whatsoever kind and nature and wheresoever situate, I give, devise and bequeath to my two sons, Arthur S. Detsch and A. Jackson Detsch, share and share alike * * *.

"Lastly: I hereby nominate and appoint Arthur S. Detsch as executor, * * * but if for any reason he cannot so act, then, I hereby nominate and appoint The United States National Bank of Portland * * *."

We now return to the correspondence. August 8, 1944, Arthur sent Jackson a telegram which said:

"Mother's nurse wants me at Portland tomorrow. Situation getting progressively worse. Afraid serious steps must be taken immediately. Joint action necessary now. Stand by for a possible quick trip to Mother at Portland."

August 11, 1944, Jackson received from his mother a long letter which said:

"I came back by air route and felt pretty nervous. It seems my nervous system can not stand so

much.  The doctors here believe in pills but it keeps my head aching and I tell them, but they say I am well, but dear my head is aching  * * *.  My will I made the same and made Arthur I forget what you call it maybe Executor as he lives in Portland.  I am extremely nervous and everything seems to make it so.  I have all kinds of pills, but they do not help me and so go on from day to day getting no better but more jittery."

We pause to state that the record warrants a belief that the pills to which she referred were of the kind which laymen call sleeping tablets.  They were made of barbital derivatives.  Evidence shows that although barbiturates act as sedatives for most people, they react on others, irritate the nervous system and induce undesirable results such as nervousness, confusion and occasionally psychosis.  Further, the aftereffects of barbiturates are undesirable.  It is clear that Mrs. Detsch made excessive use of barbiturates and that in her instance they produced unwanted effects.  One of the physicians stated that they upset her badly.  The appellant's brief declares: "There is testimony of her excessive use of drugs and the consequent effect upon her mental condition."  Going on, Mrs. Detsch's letter from which we quoted repeatedly referred to her nervousness and confusion.  It declared that instead of getting better, she was becoming "more jittery" and urged Jackson to get her the help of Christian Science. We quote again:

"I am sure if you could get me someone who like the one that helped you I would recover."

Her reference was to a practitioner.  The letter complained that no help came, that pills made her worse, and, continuing, said:

"I did not take pills last eve but used Ovaltine. I have slept all night but the nervousness seems

to come back. I need help, but medicine seems to make my head worse. Arthur has tried to do all he can. This confusion in my head is terrible. I try to do without the pills but I break and so the fight goes on."

The letter ended with this plea:

"Come please and get me some place where I can get hold of myself and so save all. There is nothing wrong with me but it seems nervous is all. Please find the place where I help you mentally * * *. Come, dear son, and help me to be my self. O I pray that you may directed aright—& and it must be now or all will be confusion for all. I ask you for the sake of all. We have had guest here that have been helped. Please boys get together and let me find rest and come and talk it over and you to find rest."

Her statement, "Please boys get together" may have had reference to the fact that her two sons were not on amicable terms.

A few days later the mother wrote to Jackson:

"I got your letter and read it, * * * Arthur has written you but you don't answer to come. I need confiding help. * * * Arthur needs help. You two should get together and see what is best to do for me. The nurse comes from 9 to 5—what I need is not talk, but demonstration of love. You don't come. All you do is sent post cards.

"Why don't you come and talk to Arthur about some place to put me. This hotel is not the place for me. * * * Arthur is trying and he needs help. Don't be so selfish. You too needed help at one time. * * *."

The remark just quoted may have had reference to the fact already mentioned that when Jackson was 23 years of age he was tried for first degree murder and at

about the same time his wife sued him for divorce. His parents defrayed the expenses attendant upon these proceedings.

August 22, 1944, Mrs. Detsch wrote to Jackson:

" * * * I have tried to fight a good fight but I get so lonely for my children. * * * I try to relax but it seem I still get very nervous. Well I am 82 and I have had so many shocks and now the whole world has the jitters so it seems and so cannot relax as I should. * * * Arthur has written you many letters and feels he can say no more, he has been a good son to me, spent and spent both his money and his love and has never asked for himself. Love to all, Mother. (over) P. S. Unself love is what I need from you."

The evidence indicates that after Mrs. Detsch returned to the Mallory Hotel August 2 Arthur arranged his affairs so that he was able to be in Portland the last four days of every week and give most of those days to his mother.

August 22, 1944, Jackson wrote his mother a letter of which the following are parts:

"Received your Wednesday letter. Contrary to your statement I have written Arthur but have not received replies from him.

"You write me that you have placed your affairs in the hands of the United States National Bank and have made Arthur executor of your estate but I have not received confirmation of this either from the Penna Co. or Arthur.

* * *

"My post cards have been meant as messages of good cheer * * * I am sorry that you have felt them of no consequence. The letters I have sent you were spiritually inspired. I could not have written them otherwise. I am sorry that you thot them 'mere words.'

"When you become grateful and not wilful, loving and not maligning, patient and not importuning, cheerful and not complaining, you will find that you will become calm and not confused.

"You know how many times you have been in our home only to leave it with harsh words. That you paid us in most cases $25 a month was not the measure of our desire to have you happy with us.

\* \* \*

"We do not want to go north into an atmosphere of recrimination and abuse. I do not understand the several statements you have made such as 'we all helped you and so be fair.' Will you please explain.

"The way you are thinking will only get you from better to worse places. I cannot see you in a convalescent home staying satisfied in your present mental condition. I will not be party to any legal incarceration for I do not consider you a danger to the community. You cannot be placed in a hospital because you are physically strong.

"You are in your rightful place right now. You have only to deserve it by your corrected thinking to continue happily in that place \* \* \*."

Those observations were followed by a discourse upon religious tenets. The mother acknowledged receipt of that letter in one which said.

"As my head ached so badly and I have waited, I wrote you about my will and it is share and share alike. I think it wise to come here quickly and talk to Arthur and Mr. Pierce. \* \* \* I have a thought that it is not alright and it may not be. Please come and do not delay, and so save what is rightfuly yours and Arthurs. *Please come,* \* \* \*. Mr. Pierce is a lovely man Trust Officer and will help you both and me also. Please come at once and not let all be lost by not coming. I am very ill \* \* \*."

September 2, 1944, Jackson wrote to his mother, in part, as follows:

" * * * I received a lovely letter from Bruce to whom I had sent one of your previous letters in which he states that he has no feeling but the greatest confidence in your good health and that you have many more years of useful living in front of you."

Bruce, whose last name is Detsch, is a grandson of Mrs. Detsch. Jackson's letter next indicated that he had decided against making a trip to Portland. His letter said:

"I am not going to interfere with the confidence you have reposed in Arthur and Mr. Pierce—it is your money and your desire—and I would not want my father to feel that you could not dispose of all the things you have in the manner in which it would make you happiest. I have never been either envious or mercenary and I would not want to precipitate ourselves into an atmosphere of bickering and recriminations.

* * *

"I asked Arthur over the phone and also wrote him a letter asking him to send me a copy of your new will. As he has not replied to this request made many weeks ago and you have written me stating that you have had your affairs transferred to the United States National Bank, I would suggest that you have Mr. Pierce write me what his connection now is with your affairs, what power of attorneys you have given to his bank or Arthur to his knowledge and send me a copy of your will so that I can check it and advise you if there is any reason for the concern that you express in your letter.

"I would not want to come North just to investigate your affairs unless you gave me the power of attorney to adjust them to the best of my ability.

If this is your desire let me know and I will send you a made out power of attorney that I would require for your consideration and signature with notarization. Upon receipt of this power of attorney I will come North and spend the time necessary till on or before Oct. 1st in making the adjustments that I would think advisable and beneficial toward all concerned.

        *   *   *

"There is a lot that we would sacrifice in time and care for the love we bear you in return for your love, appreciation, trust and regard. Your seeming lack of all these attributes is the basis for your feeling that 'my head aches.' Your brain does not ache—there are no nerves in it, a doctor could cut the brain with a knife and it would have no feeling. Your trouble is a lot of conflicting human opinions which you will not drop and know that God is All, *   *   *''

September 4, 1944, his mother acknowledged receipt of the above letter; her letter said:

"I received your letter and it only seems to me to be self, I have just come from breakfast and the nurse is not here. I do not know how long I can stand this as I feel so weak and troubled. I get no help from you and I need help in all ways. Love. No one is here yet and Arthur does not come here till Wednes. Thank Bruce. I can not go much longer and may go to sanitarium. I try not to be sorry for myself. Arthur has been a good son always. Love to all."

September 7, 1944, Mrs. Detsch sent to Jackson a telegram, reading:

"Please come at once as it is important. Answer immediately."

September 8, 1944, Arthur wrote Jackson:

"Your letter of Sept. 2 to mother not only was surprising and disappointing to mother and me,

but caused mother considerable anguish. In fact, Jack, there were several of your letters to mother that could have very well been omitted regardless of your seeming justification.

"Your presence has been asked by mother by letters, wires and phone calls. I, too, have phoned, wired and written to you the same type of request, urging you to come to Portland and aid in making mother's future, short though it may be, as happy as humanly possible. Surely this request is not unusual or too exacting, particularly when you have made the same request of mother in years past.

"I think you, as a son, would want to come to your mother in this hour of need and distress. I think it is your Christian duty, * * *.

"I also feel that your demand price for your visit north to see mother was a power of attorney to act for her. This surely brought distress to mother.

"You have insinuated that I refused to send you a copy of mother's will. This is positively and wholly incorrect. You asked for a copy of mother's will when I called you long distance about the necessity for your presence here to aid in mother's future welfare. My reply to you was that you should ask mother for the copy of the will because it was mother's right and not mine to send you a copy of her will. I am sure that I have never opposed any copy of a will being forwarded to you.

"Wills are very personal matters, and I have always in the past studiously avoided discussing or commenting to mother on any of her plans for her will. To me discussing wills is like talking about death, and I have never wanted to make any connection between mother's death and money. * * *

"I further believe that you read one of mother's communications very hurriedly, or you would not have made the statement to mother that she had advised you that she had placed her affairs in the hands of the U. S. National Bank and eliminated the Pennsylvania Company. If you will go over

mother's correspondence with you, you will no doubt see that mother stated that she was planning to change from the Pennsylvania Company to the U. S. National Bank, as manager of her affairs. You will find, concurring with that statement, letters from me on that particular point and in that particular manner.

"No action in changing the management of mother's affairs from the Pennsylvania Company to the U. S. National Bank has been taken up to this minute. I carefully pointed out to you in my correspondence that if we were going to change, this was the time to change, because mother's affairs were more liquid now than they had ever been in her life. You will also see from this correspondence that I asked you to come up here and jointly go over this matter with me and the U. S. National Bank and make a joint decision on what we should do. * * *

"As I said before, if you do not come within a reasonable length of time, the responsibility of acting for mother will rest entirely upon my shoulders, for surely time is short and action must be taken almost immediately.

"Please, in your letters to mother, never mention the fact that she has never said she was sorry for what happened in San Francisco. This is your mother, Jackson, and while she might have been wrong in some instances, she has not been wrong in all matters pertaining to your welfare and happiness. As a matter of fact, Jackson, have you ever said to mother that you were sorry for incidents in your life? If you have not taken these steps, then you cannot expect all the good to come to you."

In another letter which Arthur sent to his brother September 8, he said:

"Mother has informed me a little while ago that you wired and advised that you could not get a reservation on the train in less than thirty days."

The letter tendered the defendant's assistance in securing train reservations, and stated:

"I feel sure that I can get you a space on the plane, both coming up and returning, * * *. It is necessary that you advise me the probable date of your proposed departure from San Francisco so that I can get you space approximately around that date."

September 12 Jackson wrote to Arthur as follows:

" * * * Mother has always insisted that I read her previous Wills, and, acting on the advice of counsel, it is necessary for me to have a copy of her last Will in order to advise with you as to the Pennsylvania Company. I have asked both you and Mother for this either by letter or telephone. All my letters have been carefully reviewed by professional people who are available to me here.

"According to counsel, I am told this is the information I should have:

"1. The details as to any and all Powers of Attorney which Mother may have given to any one.

"2. The present location and amount of cash funds in her own name.

"3. The location and amount in the various joint accounts Mother some years ago had put in the Wells Fargo, United States National and Philadelphia Banks in our names, with hers as Trustee— which location has been changed subsequently from time to time, and on which you told me over the telephone the amount was approximately $8500.00.

"4. A copy of Mother's last Will and a letter from the attorney who wrote it regarding his opinion of Mother's mental state at the time it was signed by her.

* * *

"Regardless of what you or Mother might say or think in your present state of mind, I cannot

serve you and Mother rightly without the information requested, and my firmness in this regard is not dictated by selfish motives, but is in the best interests of all concerned.

"My letters to yourself and Mother have been written with the desire to arrive at a community of understanding, which would make my visit to Portland a helpful as well as a happy reunion."

His mother's pleas for his presence were repelled; Jackson did not come. If he really loved his mother, we cannot understand how he steeled himself to the point where he could reject her many touching entreaties. He did not even send her a comforting message. Had she been a stranger to him he could not have been more austere. The foregoing is a bad introduction to a court of conscience for a suitor who comes with a claim to one-half of his mother's estate. This man, who wants the courts to heed his plea, treated his mother's in the manner above indicated. Not even a glimmer of sympathy can be found in the letters he wrote to his mother when she begged for his presence under a belief that it would help to regain her composure.

Jackson displayed an astonishing interest in his mother's future disposition of her bounty, and it is not difficult to detect in him a stratagem to advance his interests while his mother was suffering from the distress of mind of which we have taken note. August 16, 1941, he sent his mother two proposals. One was that she transfer to her sons control over her estate in consideration of their payment to her of an income. He argued that the plan would "avoid probate expenses which are especially high." The second was that she establish a residence in a state that imposes no inheritance taxes; he suggested that death taxes

"seriously diminish the estate." December 30, 1943, the mother wrote to Jackson:

> "Will you please return to me by return mail the original pencil written will that you made out for me to sign on your last visit to Portland? Mr. Pierce, of United States National Bank, feels that this will, while invalid and of no value, should be in my possession, inasmuch as it is the original and bears my signature."

February 21, 1944, she wrote to him by registered mail:

> "I have asked you several times to return to me the signed copy bearing my signature, but not witnessed, of the will you proposed that I should make out when you visited me here in Portland. * * * I am making this request at the suggestion of Mr. Pierce * * *. Will you please answer this letter and return the tentative memorandum will."

June 5, 1944, Jackson wrote, concerning his mother's will: "Certainly if the conditions of this will are not changed, useless money will go to the Government." July 26, 1944, he wrote to Arthur that if their mother would take up residence in Nevada or Montana, her estate would not be diminished by death taxes. Arthur spurned the suggestion. August 5, 1944, Jackson requested "copies of correspondence which has gone on with the Pennsylvania Company regarding such a proposed change * * *. You will remember stating over the telephone you would send me a copy of Mother's proposed or executed will." Without again quoting from them, we now refer to the letters dated August 22, September 2 and September 12, which Jackson wrote. The first of these refers to his mother's will and trust. The second suggested that she send him complete information about her estate, a copy of her will and a power of attorney executed in his favor. Upon receipt of that, he said, he would come to Portland. The third

of the aforementioned letters declares that he had consulted attorneys and that, acting upon their advice, he wanted a power of attorney from his mother, the location and amount of all her cash funds, the location and amount of past bank accounts, a copy of her will and a letter from her attorney giving "his opinion of Mother's mental state at the time it was signed."

Without reference to more of the letters, the above will suffice to show that while his mother was begging him to come to her under a belief that his presence would help her, Jackson was advancing counterdemands which, if successful, would have yielded to him control over her estate. The appellant wants us to believe that he was unselfish and prompted only by a purpose of helping his mother. But since it is manifest that his mother did not care to give him a power of attorney and did not want him to have the documents he sought, we find it difficult to think that his continued insistence upon his demands and his refusal to come unless they were met were prompted by unselfish motives. Even after his mother came to his home September 18, 1944, Jackson continued to write letters to Mr. Pierce urging that he be given a copy of his mother's will, and even after Mr. Pierce replied that he could not comply with this request, the appellant wrote more letters to like effect. Still other letters which the appellant wrote to Mr. Pierce inquired for the bank's "pre and post demise charges." It is hard to so think of anyone, and yet that inquiry seems to warrant a belief that the appellant was trying to calculate the net amount his mother's demise would yield to him. He also inquired of Mr. Pierce whether "your Trust Laws in the State of Oregon eliminate the necessity for a probate" and then set forth a listing of California probate

charges so that Mr. Pierce could make a comparison of similar charges in effect in Oregon. We repeat that the foregoing constitutes an unfavorable introduction to a court of conscience for the appellant. But we will go on.

Although Jackson did not come to Portland, his wife, Josephine, arrived in that city September 13, 1944. She went at once to Mrs. Detsch's hotel room. As a witness, she testified that she informed her mother-in-law, "I would open the home to her gladly, and I didn't insist on it at all, I wanted her to make her own decision." She said that Mrs. Detsch appeared undecided, but September 17 the two left Portland on the train for San Francisco.

September 15 the visit to the Trust Department was made, which we have already mentioned. Of those who were present all except Mr. Pierce, as witnesses, gave accounts of what occurred. Mr. Pierce died prior to the trial. In their description of what took place there was no material difference. No one claims that any undue influence was exerted, nor does anyone contend that Mrs. Detsch failed to understand the contents of the declaration of trust. As we have said, Jackson, as a witness, testified that he approved the declaration of trust, and the assignments of error do not challenge its regularity and validity. After the group had assembled, Mr. Pierce, according to Josephine, mentioned the mother's diamonds. We now quote from her testimony:

"Mr. Pierce said that due to extra expense for the nurse and so forth that it appeared as if mother's jewels she had, her diamonds, would have to be sold, and I spoke up—this was in front of everyone in this conference room, privately — I spoke up and I said it was a pity to sell what she

had, that I felt it belonged to the boys, the two boys, and that should in turn, keep them for their—well, I don't know if I mentioned children, but that is what I inferred—and I offered to buy them, * * *."

Mr. Pierce's purpose in mentioning the diamonds was to suggest to Mrs. Detsch a means of supplementing her cash resources. In the course of the discussion Mrs. Detsch's will was produced and its provisions for distribution of the jewelry were read. At that juncture his mother placed in front of Arthur the articles of jewelry which the will intended he should receive and in front of Josephine the items which the will bequeathed to her husband. That having been done, the following occurred, according to Josephine:

"Mother said to me, 'Don't you like that Josephine?' And I said, 'Mother, they are lovely.' And I said, 'I will take them to Jackson, thank you a lot.' And I got up and kissed her; and she turned to Arthur and Arthur said the same thing and the same thing happened. We were both very much touched, I am sure, and very grateful."

Miss Higley testified that after Mrs. Detsch had made the gifts of her jewelry the proposed declaration of trust was brought forth. According to her, Mr. Pierce read aloud the instrument and discussed its terms with Mrs. Detsch. All of those we have named were present when this was done; the group, as already indicated, included Josephine. The latter, however, did not believe that the declaration of trust was read upon that occasion. After the discussion Mrs. Detsch signed the instrument.

From Miss Parsons' testimony, which was substantially the same as Miss Higley's, we quote:

"After he (Mr. Pierce) read it he asked Mrs. Detsch if that is the way she wanted it and she said

yes, and Miss Higley witnessed it and I, and a copy was given to Mrs. Josephine Detsch and Mr. Arthur Detsch, and there were several copies and I believe Mr. Pierce kept one himself.''

All those who were present when the declaration of trust was signed, with the exception of Josephine and Mr. Pierce, as witnesses, expressed the belief that the trustor possessed testamentary capacity. Josephine was not asked for her opinion. Mr. Pierce died before the trial, but, as we shall later see, wrote a letter before his death in which he said that Mrs. Detsch's mind was sound. Two days after Mrs. Detsch distributed her jewelry and signed the declaration of trust she and Josephine left for San Francisco. According to Josephine, her mother-in-law stood the trip ''very well'' and enjoyed her train experiences.

From the foregoing we see that Josephine was constantly with the appellant's mother September 13 to 18, both inclusive. They slept in the same hotel room in Portland and went about that city in taxicabs. They ate together and went more than once to the United States National Bank. Likewise Josephine saw her mother-in-law distribute the jewelry and sign the declaration of trust. The two were together upon the train which transported them to San Francisco and in the car which took them to Josephine's home. Thus Josephine had an excellent opportunity of observing Mrs. Detsch's conduct, habits and mind. She mentioned no peculiar, erratic or untoward action upon her mother-in-law's part. She attributed no senseless talk to her and, in fact, was not even asked if in this five-day period the decedent said or did anything that lacked reason. Likewise she was not asked for her opinion concerning her mother-in-law's mind. In short, there is

no basis for doubting that Mrs. Detsch possessed the normal mental capacity of a woman of her years when she came to her son's home.

When his mother entered his home September 18, 1944, she was well past 80 years of age, and Jackson had not seen her for almost three years. Those being the circumstances, he was interested in observing her health, alertness and appearance. He found her to be "in very good shape." In addition to describing her in those words, he gave the following testimony:

"Q. And very bright, and talked to you?
"A. Yes, she did.

"Q. She knew all about the house, and who you were, and everything she had always known, didn't she?
"A. Yes, indeed.

"Q. And as far as you observed there was nothing unusual about mother when she arrived, was there?
"A. No, I don't think there was at that time."

The first night after the decedent came to Jackson's home she entered the room in which he and Josephine slept with the complaint that her head hurt and she had been unable to fall asleep. In her troubled wakefulness, worries about finances harassed her sleepless brain, so she told her son and daughter-in-law. At that juncture Josephine, in order to induce sleep to come to her husband's elderly mother, prepared some hot Ovaltine for her and read to her. Her efforts were successful, but the next night Josephine's sleep was again interrupted and she again had to resort to her simple expedients to bring sleep to her mother-in-law. Although the testimony concerning these sleep-interrupting episodes is detailed and indicates that

Josephine disliked the interference with her rest, we are certain that this evidence is not indicative of lack of mental capacity. Many elderly people experience difficulty with their nights and some who are not elderly cannot find sleep in a strange bed for the first night or two away from home.

The third morning after Mrs. Detsch had entered her son's home she left it in an early hour, unbeknown to its three remaining sleeping occupants, and sent Arthur a telegram saying that Jackson had demanded of her a power of attorney. The mother came home in a taxicab and thereupon was questioned by her son as to the nature of the errand which took her out at that early hour. She declined to yield information. Shortly there came to the house for the mother the following telegram from Arthur:

> "Answering your wire Sept. 20. Cannot understand why Jackson demands power of attorney when present arrangements with U. S. Bank satisfactory to you. Do not approve of his demand. Do not act without Jackson or you consulting with me. Be calm until I consult with Mr. Pierce. Writing. Love."

When the appellant read the telegram he promptly put into effect an order which denied to Arthur, Mr. Pierce and all others the privilege of communicating with his mother except through him. Mail addressed to the mother, under this order, had to be contained in unsealed envelopes. Jackson swore that he had not made the demand mentioned in his mother's telegram, and likewise swore that he imposed the censorship in order to prevent his mother from receiving disquieting messages. We are now at the point where the purported mental breakdown in Mrs. Detsch occurred. Up to this

day "mother was normal". The quoted words are those of Jackson. From this day on, according to Jackson, she was irrational.

When Jackson inhibited his mother from receiving any communications that had not been examined and approved by him, no letters, telegrams or telephone calls had come for her except the single one quoted, and therefore we know of no basis for his surmise that disquieting messages would come to her which he must intercept. Further, up to that point, this elderly woman had done nothing in Jackson's home except to engage her son, daughter-in-law and great granddaughter in conversation and in familiarizing herself once more with the home's appointments. The evidence wholly fails to mention anything she did that threatened the home's tranquility and suggested the necessity of countermeasures. After Jackson had inaugurated the censorship, letters that came to the home for his mother, even by registered mail, and from her grandsons, were returned by him to the senders. Upon an occasion when Mr. Pierce resorted to the long distance telephone, physical force was used to keep Mrs. Detsch from the receiver. Later, Jackson, in commenting upon this incident in a letter to Mr. Pierce, said: "Mother was very frantic in her endeavor to talk to you on the telephone." We notice that the appellant's brief states that Jackson's censorship would not have prevented Arthur from sending to his mother unsealed letters or of coming to Jackson's home and there visiting the mother. The incident we just mentioned in which the mother was denied the privilege of speaking to Mr. Pierce on the telephone in the presence of the family refutes this contention. The rigor of the censorship is indicated by the fact, vouched for by the appellant, that two post-

cards which the mother wrote to Arthur were intercepted and taken to his (appellant's) office and were there copied before being forwarded in the mail.

Concurrently with the establishment of the censorship, a nurse was employed for Mrs. Detsch. The latter had not requested the nurse, but was charged with her salary and other expenses. Mrs. Detsch had not suffered any ill health or other setback that demanded nursing service. Although no physician had been consulted, the nurse placed Mrs. Detsch on a diet that included no meat and permitted her to have only a light meal at dinnertime. Just as Mrs. Detsch was not consulted before the censorship was imposed and the nurse was employed, so also her wishes were not ascertained before this additional regimen was inaugurated. Mrs. Detsch had always enjoyed her meals and had been a hearty eater. She resented the new order and asked that she be given the same food that the others at the dinner table were enjoying. The denial of her wishes brought on unpleasant episodes, with the result that she was given her dinner in the kitchen upon a folding table. Shortly her meals were served to her in a downstairs room known as the billiard room. One of the functions of the nurse was to keep Mrs. Detsch under surveillance—a fact which the latter deemed offensive. Matters became so unpleasant that the first nurse stayed only a week. A second stayed two days and then one by the name of Mrs. Sylvia Romaine was hired. Mrs. Detsch had no voice in the selection of any of the nurses. Not only were the salary and all expenses incidental to the nurse's employment billed to the trust fund, but Jackson made a charge of approximately $50.00 per month for his mother's meals. By reverting to the excerpts which we quoted from his letter of

August 22, 1944, it will be seen that he always charged his mother board whenever she visited his home. He was not in necessitous circumstances and, as a witness, described himself as worth $85,000.00. His home bordered on the palatial. Although these expenses were charged against the trust estate, Mrs. Detsch, owner of the trust fund, was given a copy of none of the statements. Her approval or disapproval was never requested and she had no means of knowing to what expenses she was being subjected. As we have seen, Jackson denied her the privilege of speaking on the telephone to Mr. Pierce, the trust officer, and of receiving any mail from him unless it came in unsealed envelopes and met his approval.

We just mentioned the employment of Mrs. Romaine as nurse. About a week after she was hired she was placed on a 24-hour schedule. Up to that time Mrs. Detsch had occupied a bedroom on the second floor. She was now moved to a small room, 8 by 12 feet in size, adjacent to the downstairs billiard room. We explain that the plaintiff's home stood on a slope and that although at street level it was two stories, in the rear it was four stories high. Mrs. Romaine claimed she had seen Mrs. Detsch in perilous positions on an upper porch and decided she should be transferred to the lower level. This lower level room, in addition to being small, apparently was undesirable. Although Mrs. Romaine claimed the move was made for Mrs. Detsch's safety, letters written by Jackson and Josephine do not support this claim. In a letter dated October 7, addressed to the defendant bank, Jackson, after stating that on that morning his mother "physically resisted the nurse, who is fortunately a sturdy woman," explained that this badly upset his wife, with the result

that "today I am changing mother to the room downstairs." Josephine, in a letter to Mr. Pierce, which gave the reason for the change, said: "We felt that by doing this we could control her better and watch over her more rigidly."

Mrs. Romaine kept the decedent under close, constant surveillance and followed her from room to room. That fact irritated Mrs. Detsch. She and Mrs. Romaine seemingly had little in common. Mrs. Romaine thought that her patient was irresponsible and imbecilic. Mrs. Detsch deemed the nurse cruel and had no confidence in her. Possibly an index to Mrs. Romaine's nature can be found in an answer we shall quote and which she made when counsel were questioning her concerning her background. Referring to her husband, she said: "Sometimes he says he is a bartender, and sometimes he says he is a steward." At one time she had taken care of Harry K. Thaw, the man who took the life of Stanford White. Although Jackson conceded that his mother complained to him about Mrs. Romaine, she was not dismissed; to the contrary, as we shall presently see, her authority was increased.

After Mrs. Detsch had been placed in the lower level bedroom the window of the latter was so nailed that it could be opened for only a few inches. At night Mrs. Romaine placed a tall, heavy bureau in the doorway of Mrs. Detsch's room so that the latter could not leave her room unless she climbed over the bureau. Having done that, Mrs. Romaine put her own bed alongside the bureau and thus if, through agility, Mrs. Detsch managed to climb over the bureau she would have to cross Mrs. Romaine's bed, thereby arousing its occupant.

From the foregoing, it is seen that three days after the mother entered her son's home she was subjected

to a new line of treatment in the selection of which she had no choice. Moreover, her son was determined that the procedure which he had prescribed should be followed. A letter which he wrote a few days after his mother entered his home said: ''I have been told that firmness with compatible gentleness is the only way to treat persons in mother's condition.'' About the same time his wife, referring to her mother-in-law, wrote: ''She is emotionally upset and needs complete obedience to those who are trying so earnestly to help her.'' It seems evident that about three days after this 83-year-old woman had entered her son's home a complete change in her way of living was required of her. ''Complete obedience'' upon her part was exacted ''with firmness.'' She went to Jackson's home thinking that she would become a guest or a member of his household, but when the third day had passed she found that her status was akin to that of an inmate.

Mrs. Detsch's discovery that her freedom had been inhibited had a disquieting effect upon her. For instance, September 28, 1944, she wrote a letter to Mr. Pierce, in which the name ''Joe'' refers to Josephine: It said:

> '' * * * How are my affairs. Joe tells me nothing and I fret so if I could find a place to rest. Excuse this paper as I am not young and so weary with useless chatter like someone insane. Joe goes out soon and I will try and get someone to get a stamp. I eat in the kitchen here and the family eats in the dining room, and I feel that I am a prisoner because she keeps me watched. * * * Even if you write I won't get the letter * * * .''

Appellant's reply brief says: ''Undoubtedly decedent violently resented the restrictions.''

One month after Mrs. Detsch entered her son's home another change, a drastic one, was made. She was transferred to the home of Mrs. Romaine who lived two miles from Jackson's house. Concurrently with the transfer, Mrs. Romaine was hired on the basis of $15.00 a day to look after Mrs. Detsch. It is evident that she was not expected to serve primarily as a nurse but as a keeper or custodian.

Before Mrs. Detsch was transferred to Mrs. Romaine's home she was told about it, but was granted no veto power. Jackson conceded that his mother did not want to be taken to her place. Although it was the mother's, and not Jackson's, money which would foot the bills, her objections were brushed aside and the transfer was made. There is no claim that Arthur was consulted concerning the transfer, and if he was informed that his mother was no longer in his brother's home or was given her new address, no witness mentioned the fact.

It seems clear that by the time Mrs. Detsch was transferred to Mrs. Romaine's home many unpleasant episodes had occurred in Jackson's home and that strained feelings had resulted. No witness expressly mentioned the strained relationships, but they can be inferred from events that transpired. For instance, when Mrs. Detsch was in Josephine's car on the way to Mrs. Romaine's place she made a spirited but futile attack upon her daughter-in-law. The latter and Mrs. Romaine subdued her. Again, after she had been transferred to Mrs. Romaine's home she was never brought back for a meal or even a brief visit in Jackson's home. Before she was removed from the latter she complained to some neighbors, according to Josephine, about the ill treatment to which she was being subjected. While in

Mrs. Romaine's place her daughter-in-law never called upon her, but Jackson made five or six visits. We notice that a letter of his to the defendant bank which demanded payment of sums due Mrs. Romaine, said: "I have made no mention of gasoline expenditures necessary to visit mother." Evidently he deemed his omission to charge for the gasoline was a virtue worthy of recognition. Jackson, as a witness, in referring to his mother, repeatedly employed such expressions as "She had nothing to fear. Love was around her." We find it difficult to reconcile those declarations with his course of conduct.

We mentioned the fact that Mrs. Romaine's position was that of a keeper rather than that of a nurse. If Mrs. Detsch was not wholly mentally deficient she naturally resented being assigned to an inmatelike status, and accordingly we will spend a moment or two more on Mrs. Romaine's testimony. She testified, "It was my decision" when the decedent was transferred from the upstairs bedroom in Jackson's home to the lower level room. In other words, Mrs. Detsch was not consulted. She also testified:

"I objected to her eating in the dining room. I was the one who objected to her eating in the dining room and the breakfast room, both. * * * I said if she couldn't behave herself at the table that she had better eat in her own room."

Further showing the manner in which Mrs. Detsch was given no choice whatever in matters that are normally entrusted to the individual's discretion, we have the following answer made by Mrs. Romaine:

"Yes, she wanted to go to church. And I said, 'Well, you can go to church providing your son wants you to go to church.' Of course, I didn't have

full say over her on those things, naturally. So I asked Mr. Detsch if she could go to church.''

She swore that while she took care of Mrs. Detsch in Jackson's house,

"We had rules and regulations that I had to follow. If somebody said I overfed her and so forth, it wouldn't sound so good for me.

"Q. What rules and regulations did you have in the Jackson Detsch house that prohibited you from giving her enough to eat?

"A. I was following hospital rules when I was in their house, because I had to chart it, and I had to show it.''

No physician had prescribed the regimen and, according to the evidence, Mrs. Detsch was well physically. Thus it is seen that the decedent's wishes were not consulted concerning the food she ate, the room she occupied and the matter of going to worship. Further, Mrs. Romaine testified that after Mrs. Detsch was transferred to her house she gave all of Mrs. Detsch's mail to the appellant. For instance, she said:

"I preferred giving them to Mr. Jackson Detsch first, because I thought maybe he knew best as to what to do with her mail, and if there was anything in the letters that he should know about it before she got them; I thought it was no more than fair and right as a guardian over his mother that he should know what was going on.

"Q. All mail that came to her at your house you gave it to Mr. Jackson Detsch first?

"A. That is it.

"Q. Even letters from her other son?

"A. Any mail that she had.

"Q. Regardless of who it was from?

"A. Even if it was an advertisement, I always gave him the mail first.''

Mrs. Romaine regarded her charge as an imbecilic person who was unworthy of consultation. For instance, she testified:

> "She couldn't even take care of a dollar bill. * * * She wasn't capable of even combing her own hair or putting on her own clothes. I didn't pay much attention to her because, for one thing, you couldn't make out what she was talking about.
>
> &ast; &ast; &ast;
>
> "Q. Would you describe Mrs. Detsch as helpless?
>
> "A. Yes, absolutely.
>
> "Q. Would you describe Mrs. Sarah T. Detsch as mentally helpless?
>
> "A. Yes."

Not only did Mrs. Romaine treat Mrs. Detsch as an incompetent, but her son did also; for instance, he testified:

> "Q. And would you say she was mentally unsound?
>
> "A. I would say that she was mentally unsound, yes. She was irrational. She had hallucinations and she had delusions.
>
> "Q. She did have?
>
> "A. Yes, she did.
>
> "Q. Would you say she couldn't reason?
>
> "A. Oh, yes, she couldn't reason.
>
> "Q. How was her memory Mr. Detsch?
>
> "A. Her memory wasn't any good at all.
>
> &ast; &ast; &ast;
>
> "A. Whatever she knew was a false idea."

Since he regarded his mother in the manner just indicated, he treated her accordingly. The brief he filed in this court says:

> "She was incapable of exercising the self-restraint which normal people impose upon them-

selves through common decency, good manners and instinctive regard for others. * * * It was as dangerous to leave her to wander around by herself, in view of these circumstances, as it would be to allow an infant to wander around by itself without the taking of proper precautions for its safety."

We reviewed the above for the purpose of showing the treatment to which the decedent was subjected after she came into the hands of the appellant. She was deemed an incompetent and was treated accordingly. She received no mail and was denied access to the telephone. She was placed under constant surveillance and if her wishes were ever consulted, no witness disclosed the fact.

Mrs. Romaine's house was a two-story structure, the lower part of which was a garage. In order to maintain a constant vigil, Mrs. Romaine slept in Mrs. Detsch's room. Shortly before midnight November 3, 1944, that is, about two weeks after Mrs. Detsch was transferred to Mrs. Romaine's home, she tied bedsheets together and, after fastening one end to a bedpost, sought to lower herself to the ground. Evidently her grip slipped and she fell, fracturing a bone in one of her ankles and injuring her back. Mrs. Detsch was taken to Sutter Hospital in San Francisco and remained there until December 18, when she was transferred by plane to Good Samaritan Hospital in Portland. When his mother fell to the ground November 3, Jackson was in Los Angeles and was apprised of what had occurred. He did not return to San Francisco, and neither he nor his wife visited the decedent while she was in the hospital. If either of them sent her flowers, they did not, as witnesses, mention that fact. December 11 was his mother's birthday, but although she received a short letter from him, which said, in part, "I am not sure

whether your birthday is the 10th or 11th," he sent her no remembrance. He was not aware of her departure on December 18 for Portland until some days later.

The appellant had visited his mother occasionally while she was in Mrs. Romaine's home, but after she left that place he never saw her again until three days prior to her death. As we said, she was transferred to Good Samaritan Hospital in Portland December 18. She remained in that hospital until near the first of April, 1945. If the appellant sent her any flowers or gifts while she was there, he made no mention of it when he testified. He swore that he wrote to her frequently while she was in Good Samaritan Hospital, but admitted that he received no replies.

March 25, 1945, Jackson spoke to his mother on the long distance telephone. Describing the conservation, he testified that at its beginning his mother was attentive and affectionate, but when "I mentioned something about falls" she suddenly changed, "and then she says, 'I know all about falls.'" We quote further:

"And then she began to be very vehement and said all I did was send her postals and that I wasn't her son, and she kept that up for a few minutes, and then I hardly could get a word in edgewise, * * * and she hung up the telephone, and that was all."

About four months prior to that conversation the mother, referring to Jackson, wrote in a letter, "I would to God he had never been born."

Upon her discharge from Good Samaritan Hospital, Mrs. Detsch returned to the Mallory Hotel where she resided for the succeeding year. During that year she had no nurse or other attendant and looked out for herself. July 11, 1945, she called upon Dr. T. Homer

Coffin with a complaint about nervousness, inability to sleep and a swelling of her ankles. She continued under Dr. Coffin's care until March 20, 1946. She went to his office regularly. April 3, 1946, she consulted Dr. H. H. Dixon, who confines his practice to diseases of the nervous system. April 13, 1946, upon Dr. Dixon's advice, she entered Fairlawn Hospital, which accepts those who suffer from nervous afflictions. While there Dr. Dixon visited her regularly. Mrs. Detsch died in Fairlawn Hospital August 15, 1946, one year, nine and one-half months after the termination of the so-called crucial period. August 15, 1946, was one year, six and one-half months after she had signed the amendment to the declaration of trust.

We know of nothing which indicates that Jackson sent his mother any flowers or gifts after she returned to the Mallory Hotel and after she entered Fairlawn Hospital. Shortly after his mother departed with Josephine for San Francisco September 17, 1944, Arthur suffered a severe heart attack. While Mrs. Detsch was in Sutter Hospital Arthur sent her flowers and the two talked to each other at times upon the long distance telephone. We have now advanced to the point where the decedent was discharged from Good Samaritan Hospital and resumed her residence in the Mallory Hotel. April 25, 1945, Jackson sent Mr. Pierce a letter which stated:

"My experience with your handling of my mother's affairs convinces me that you are incompetent, unreliable, uncooperative and prejudiced * * * . I want you to resign for your bank the trusteeship of Mother's affairs, * * * and I will ask you to file with me an itemized statement of all disbursements and receipts since the date of the origination of your bank's trusteeship.

"A copy of this letter is being sent to my mother."

It is clear that that letter was written without the knowledge of the decedent, who deemed Mr. Pierce a valued and thoughtful friend. Josephine described Mr. Pierce as "a very nice gentleman." In the period when his mother refused to write to him, it was Mr. Pierce who gave Jackson his mother's address and information about her.

April 30, 1945, Jackson received a letter from his mother, the first that had come to him from her for many months; it said:

"Received your letter of April 23st & was certainly shocked. I knew Mr. Pierce sometime before I transferred my affairs to the United States National Bank & so have been perfectly satisfied. Please dont write any more letters like that. You can always see me & can also see Mr. Pierce."

It is apparent from the foregoing that after the decedent had left San Francisco, had recovered from her fall and returned to the Mallory Hotel, Jackson still had his mind upon her wealth. Just as he disregarded her wishes about the nurses, her mail, her room, her freedom from surveillance and her preferences about food, so also he brushed aside her satisfaction with the trust agreement and felt at liberty to demand that Mr. Pierce terminate the trust. Seemingly, the desires of the woman who brought him into the world meant nothing to him. We also see from the above that his mother, after having fully recovered from her fractured ankle, did not recover from her feeling that her son and Josephine had been cruel to her. She evidently construed Jackson's above-quoted letter as another unhappy episode.

We shall now review some of the evidence which Jackson presented and which he argues shows that his mother was suffering from advanced senility. After we have reviewed it, we will turn to some to the opposite effect. We will endeavor to segregate this evidence according to its bearing upon Mrs. Detsch's (1) control over her bodily functions, (2) her ability to dress herself, (3) her table manners, (4) her memory, and so forth. Some of those are slight matters, but during the crucial period aforementioned Mrs. Detsch's activities were prescribed. We will reserve for later consideration other evidence that deals directly with her mental capacity.

Jackson swore that his mother "had no control over her urination and the beds had to be taken care of." From Josephine's testimony, we quote:

> "She also was uncontrolled in her actions at night which necessitated personal attention, and she would have the same thing happen to her during the day.
> "Q. You mean lacking control of urination?
> "A. I do, that and the other also."

Dr. F. T. Hodges, a physician who practices in San Francisco, and who swore that he called upon Mrs. Detsch in Jackson's home in December, 1938, at the request of Josephine, testified:

> "She was incontinent of bladder and had the odor of one who is saturated with urine. On One occasion I recall having seen a rubber sheet on the bed to protect the mattress because of this."

So much for that. We come now to another phase of her daily life. Dr. Hodges, aforementioned, who saw Mrs. Detsch only in 1938 and never thereafter, thought that she was old "beyond her years." According to

him, "her skin was typical of senility in its thinness, dryness and pigmentation."

Josephine swore:

"Mother started to refuse to dress herself, and she said she couldn't take a bath any longer, she was old and she didn't want to bother."

Illustrative of that observation, the witness described an incident which she said occurred on a Sunday when her husband wished to take his mother to church. By that time Mrs. Romaine had been employed to assist in caring for Mrs. Detsch. Upon the Sunday morning in question, Josephine, according to her testimony, heard a commotion in the room occupied by her mother-in-law and, upon rushing to it, saw her lying in bed and trying to kick Mrs. Romaine. We now quote from her testimony:

"Q. After you got there what was said by whom?

"A. Mrs. Romaine said, 'I can't get her to get dressed.'

"Q. What did Mrs. Detsch say?

"A. She said she wanted to go to church but she wanted to go the way she was.

"Q. How was she dressed?

"A. She had on a nightgown with a dressing robe over it.

"Q. Well, what occurred there? Did things quiet down or did it, and she didn't go to church or what happened?

"A. No, sir, she continued to carry on with the nurse, and as the nurse was leading her into the dressing room, or into the bathroom, she went around the side of the bed and mother threw herself on the floor and kicked and screamed she wasn't going to get dressed. At that time Dad (appellant) came running upstairs."

The following is Jackson's description of the incident:

"I went up there but when I got up there Mother was writhing on the floor and the nurse was acting as if something had happened.

"Q. Acting as though she had been upset about something and had been in a scuffle?

"A. Nurse Romaine was acting like Mother had struck her.

"Q. But your mother was on the floor; did you pick her up?

"A. I guess we all went and aided her, but I don't have any detailed recollection on that.

"The Court: Mr. Detsch, you can answer that question yes or no.

"The witness: No, sir, I can't remember, sir.

"Q. You picked her up, if anyone?

"A. That I don't remember either."

According to Jackson's witnesses, his mother went about the house unclothed or dressed only in a nightgown until someone induced her to put on clothes. His witnesses mentioned occasions when his mother wandered out upon the public street wearing nothing but a nightgown. When she dressed herself, these witnesses, who consisted largely of Jackson, Josephine, their granddaughter and Mrs. Romaine, claimed that she got her clothes on inside-out. Mrs. Romaine swore that Mrs. Detsch, in putting on shoes, failed to get on pairs. Such was the evidence presented by Jackson in regard to his mother's habits about bathing and dressing.

Evidence presented by the appellant averred that Mrs. Detsch was incapable in conversation of hanging onto a thought long enough to complete it. Mrs. Romaine put it this way:

"She would say a few words about something that had happened, and then right away she would

change the subject to something different and without even finishing what she was talking about first."

Jackson, referring to his mother, testified:

"She was irrational. * * * She couldn't reason * * * she would get incidents confused and time confused."

Some of Jackson's witnesses described Mrs. Detsch's table manners as slovenly. His 18-year-old grand-daughter, referring to her great grandmother, testified:

"She did have quite a habit of gritting her mouth and looking—just clacking away. When she ate she was sloppy and some would get on the floor. We had a time picking up after her.

"Q. She would drop bread and things like that?
"A. And gravy."

Josephine testified:

"Well, as I said, Mother had a habit of working her mouth all the time, and she was rather a little— she would spill the food on the floor."

The witness stated that she noticed these habits upon the part of her mother-in-law as early as 1941 when Mrs. Detsch was a guest in their home. Mrs. Romaine testified:

"She would shove things that she didn't want aside, and slop things all over the table, and then she would take someone else's."

Some of Jackson's witnesses testified that Mrs. Detsch's memory was very poor. For instance, Mrs. Vilhauer, a nurse who attended Mrs. Detsch in Sutter Hospital, testified:

"She couldn't remember what she told me the day before."

Jackson said:

"Her memory wasn't any good at all."

Shortly he added:

"Generally speaking, she didn't know all her assets or the locations of them.

"Q. That is in September of 1944?

"A. I would say so.

"Q. And that continued on until the end, did it?

"A. Yes, it did, to my knowledge."

Mrs. Romaine testified:

"She wasn't capable of even remembering anything; that was one thing; and she seemed like she needed someone to care for her.

\* \* \*

"Q. Did she have a marked loss of memory?

"A. Oh, yes, she couldn't remember anything hardly. Down at my house I phoned one day to Portland, the first time I phoned to Portland for her; that was in the morning; and then she wanted me to phone again in the afternoon. She said, 'Don't you remember, you promised to phone to Arthur today?' And I said, 'We phoned this morning, honey.' "

Mrs. Vilhauer, whom we have mentioned, swore that letters which Mrs. Detsch wrote were incoherent. We quote:

"A. Yes, letters came and I would read those, and she would answer those and want me to mail them in the morning, and want me to mail them, but I didn't.

"Q. Why?

"A. Well, they were so erratic. She had about twenty-four postal cards and she would sit up and write things, and the subject was incoherent, and I would promise her I would mail them, but I didn't \* \* \* ."

We shall review the evidence showing only one more of the characteristics which Jackson attributed to his mother and which, he says, showed her mental breakdown. This evidence, if accepted as a correct index to Mrs. Detsch's mentality, shows that she needed constant watching, for otherwise she would (1) fall or jump from a window or porch, (2) wander away, (3) give false accounts about her son's home, and (4) take someone else's belongings. The son presented evidence that his mother, before being transferred to the lower room, repeatedly leaned far out over an upper porch railing. Mrs. Vilhauer, the nurse, swore that while she attended Mrs. Detsch in Sutter Hospital she feared that her patient, although encumbered with a heavy cast, would try to escape through a window. She testified:

"Yes, she was always watching that window sill. She would say, 'How far down is that?' And I sat right next to it while there. We didn't leave the room. If I left the room another nurse had to come in."

Josephine and Mrs. Romaine swore that Mrs. Detsch wandered away more than once and was found only after searches had been conducted. Upon one occasion, according to Josephine, police officers returned her mother-in-law home. Mrs. Romaine described an instance when some soldiers encountered Mrs. Detsch wandering in the rain without any wraps. She mentioned another time when during a rainstorm a police officer found her bareheaded far from home. According to other evidence along this same line, Mrs. Detsch was unable to distinguish between her belongings and those of others. For example, Jackson claimed that upon one occasion five dollars was found in her purse that belonged to Mrs. Romaine. One of his witnesses,

referring to the elderly lady, testified: ''She was erratic, I found she didn't tell the truth.'' Along the same line, Jackson offered the evidence that showed his mother sent the telegram to Arthur saying that he (Jackson) had demanded a power of attorney. He testified that the telegram was false. Josephine swore that her mother-in-law, while occupying the lower level room, gave the neighbors and some police officers false accounts about it.

Contrasting sharply with the evidence just reviewed is other testimony to which we will now proceed.

It will be recalled that some of the appellant's witnesses swore that Mrs. Detsch was incontinent of bladder and bowels. Ida L. Harmon, who was the housekeeper in the Mallory Hotel, had known Mrs. Detsch for more than a score of years. Their friendship began in 1921 or 1922, when Mrs. Detsch patronized the Nortonia Hotel in Portland and the witness was the housekeeper in that establishment. Mrs. Harmon said that she came to Mrs. Detsch's room virtually every day and that the condition of the bed linen ''was good.'' She added:

''Nothing wrong with it that I seen.

''Q. It was not soiled or stained?

''A. Not that I ever seen.''

That testimony covered, not only the period before Mrs. Detsch went to San Francisco, but also the year after she returned to the Mallory Hotel following her discharge from Good Samaritan Hospital and before she went to Fairlawn Hospital. Miss Higley was asked, and answered, as follows:

''Q. Do you know whether or not she had any trouble with retaining urine?

"A. None whatever while I was with her."
Physicians and nurses who cared for Mrs. Detsch while she was in Sutter and Good Samaritan Hospitals were examined carefully concerning her condition, physical and mental, but not one of them mentioned the disability of bladder and bowels attributed to her by Jackson. Likewise, Mrs. Romaine, who slept in the same room with Mrs. Detsch and who was severely critical, did not claim that her patient was incontinent of bladder and bowels.

It will be recalled that Dr. Hodges testified that when he saw Mrs. Detsch in 1938 (six years before the crucial period) he noticed that she looked old beyond her years and that her skin was "typical of senility in its thinness, dryness and pigmentation." Dr. Hodges saw her only once. Miss Higley, who saw her daily for six weeks immediately before her departure for Jackson's home, swore:

"She was very well preserved for a woman of her years."

Another witness commented upon her well preserved body. Miss Higley also testified:

"A. She had a good skin and complexion.
"Q. Her hands, were they wrinkled or bent?
"A. She had very good hands for a woman much younger than she was."

Miss Parsons, who was fond of Mrs. Detsch and saw her frequently before and after the San Francisco episode, testified:

"Q. How was she with reference to her dress?
"A. She dressed very well.
"Q. How was her skin?
"A. Very nice. She took very good care of it. She used lots of creams and powders."

Mrs. Harmon thought that she "was very good for her age."

The appellant, it will be remembered, presented evidence indicating that his mother refused to bathe and dress. His evidence also indicated that after one had labored with her and persuaded her to put on clothes, she got them on awry. Miss Higley swore that Mrs. Detsch bathed every day and that "she wanted to be sure she looked nice before she went on the street." According to her, Mrs. Detsch bathed twice on warm days. Mrs. Katherine Katterman, a nurse who attended Mrs. Detsch in Good Samaritan Hospital, testified that Mrs. Detsch was fond of visiting other patients and of dressing neatly for the visits. We now quote:

"A. Yes, she would come and visit with my patients. She would get herself all dolled up of an afternoon.

"Q. What do you mean 'all dolled up?'

"A. Had her hair fixed, and what was it, something else. She came back all fixed up real pretty and she says, 'Now, I am ready.' "

Miss Parsons, referring to the time that Mrs. Detsch was in Good Samaritan Hospital, testified:

"Q. Did you have occasion to take her out of the hospital?

"A. Yes, I took her out one day for a manicure, and another day for a shampoo.

"Q. Where did you take her for those?

"A. To the Meier & Frank beauty salon.

\* \* \*

"Q. How was she with reference to her dress?

"A. She dressed very well."

Although testimony which came from some of the appellant's witnesses showed that his mother could not

hang on to a thought long enough to complete its utterance, other witnesses gave a different account of the matter. Dr. Dixon, whom we have mentioned, referring to Mrs. Detsch, testified:

> "She did tell me many of the things she had been troubled and worried about, and gave me a rather definite reason for the change in feeling in things she brought about. * * * From the standpoint of objective examination of this woman, I could see nothing that would indicate a failing ability to exercise judgment, especially in regard to finances because she wanted to know where every penny was placed and every detail."

Referring to his patient, he said "she was very alert" up to two weeks before her death. Mr. George Flanagan, manager of the Mallory Hotel, testified that he frequently had conversations with Mrs. Detsch, about her family, current events and other matters; he was asked, and answered:

> "Q. Did she discuss these current events or other matters you discussed with her rationally and intelligently?
> "A. Oh, yes."

Mrs. Harmon testified that she had many conversations with Mrs. Detsch before and after her visit to San Francisco. She swore that the decedent "was very alert in her mind" and that she had no trouble in carrying a conversation through to its conclusion. The following is taken from her examination:

> "Q. You want the Court to understand right down to the time she left for the hospital (Fairlawn) she could talk consecutively and logically on any subject?
> "A. Yes, I think she could. She always talked to me and I never noticed any difference than any other person."

Dr. Thomas F. Ayers, of San Francisco, who was one of the two physicians who attended Mrs. Detsch when she was in Sutter Hospital, swore:

> "Her thinking was very clear, * * *. She seemed to be a very bright old lady."

Mr. Albert J. Callahan, trust officer of the Wells Fargo Bank & Union Trust Company of San Francisco, called upon Mrs. Detsch in Sutter Hospital November 8, 1944, and presented to her for signature several documents. He swore that before she signed the papers the two had a discussion which consumed the better part of an hour. Referring to the decedent, he swore:

> "The discussion was coherent and it was intelligible."

Dr. Coffin, previously mentioned, who attended Mrs. Detsch from July 11, 1945, to February 25, 1946, said:

> "I felt she was pretty smart at times, and my personal opinion about this is while she was confused at times, she always wanted to know where every penny was spent. Her bills were paid promptly and apparently she did pay attention to money matters and to her own affairs."

Dr. Carlson, previously mentioned, who attended Mrs. Detsch upon her return to Portland from Sutter Hospital, testified:

> "I remember her quite well because she was an interesting person. * * * If what you mean, do I think she was a normal individual for a person of her age, I would say yes."

Miss Katterman testified:

> "And she was an intellectual woman, a woman you could converse with."

Miss Jessie Gaunt, a nurse who attended Mrs. Detsch in Sutter Hospital and accompanied her in the plane which brought her to Portland, described her as "unusually alert and keen for a woman of her age."

It will be recalled that evidence which the appellant introduced indicated that his mother's table manners were unpleasant. From the examination of Miss Parsons, who frequently ate lunch with Mrs. Detsch, we quote:

"Q. What were her habits of eating with reference to being sloppy or not?
"A. She was very particular in her manners."

We take the following from the testimony of Miss Higley:

"Q. I just want to ask one or two more questions. You ate with her quite regularly at meals?
"A. Yes.

"Q. What did she do—was she sloppy?
"A. No, Mrs. Detsch's table manners were those of a lady.

"Q. Did she have trouble with her teeth or anything like that?
"A. Not while I was with her that I could see.

"Q. You say the manners of a lady. Did she spill food occasionally or not?
"A. No, she did not?"

Jackson was asked:

"Would things be spilled on the floor, do you remember?
"A. My memory doesn't go to spilling on the floor. It was not an outstanding factor in my mind about Mother."

We now come to testimony which varies with that given by the appellant's witnesses to the effect that his mother's memory was poor. Dr. Dixon swore that her memory of recent events "was exceedingly good." According to Miss Higley, "her memory was good." Dr. Ayers swore: "Her memory was very good. She remembered way back to her early days back East." Miss Gaunt said "she had a very good memory." We shall mention one other item of evidence bearing upon the quality of Mrs. Detsch's memory. In January of 1945, when she told Mr. Pierce that she wished to amend the declaration of trust, he sent her a letter suggesting that she write him her instructions for the desired amendment. His letter said that upon receipt of hers he would hand it to the attorneys. Mrs. Detsch complied with the request and wrote two letters to Mr. Pierce. One of them specified the change she wished made and the other narrated her reasons. The latter consisted of a detailed delineation of the treatment accorded her in the appellant's and Mrs. Romaine's homes. Her recital of facts indicates that her memory was retentive.

Mrs. Vilhauer's testimony that Mrs. Detsch handed her many postcards for mailing that were so incoherent that she, Mrs. Vilhauer, destroyed them is not unchallenged by the record. While Mrs. Detsch was in Sutter Hospital she wrote at least twenty letters and two postcards that were preserved; they are before us as exhibits. Although some of the letters are long, none of them are incoherent; to the contrary, most of them are well composed. The following is a sample:

"Dear Mr. Pierce: Received your letter of Dec. 5th regarding expenses of my transfer to Portland, as I definitely want to go to Portland. Please instruct the bank to expend such funds as may be

necessary to transfer me to Portland including the expenses of Arthur or Edna. Trusting that there will still be enough to cover expenses and not be penniless

Hoping this will cover the information you require

Thanking you for all your trouble and hoping to see you soon.''

It will be remembered that Jackson presented evidence indicating that his mother could not distinguish between money belonging to others and herself, that she frequently wandered away, that she gave out false reports concerning the treatment she was receiving in his home and that unless watched she was likely to fall out of upper windows or off balconies. After Mrs. Detsch was discharged from Sutter Hospital she entered Good Samaritan Hospital in Portland, and three months later was back in the Mallory Hotel. Both the latter and Good Samaritan Hospital are several stories in height, but no one claims that it was necessary to keep her under surveillance lest she fall out of windows. During the year she lived in the Mallory Hotel following her discharge from Good Samaritan Hospital, she took care of herself and went frequently to a bank, to her doctor's office and other places where she transacted business. There is no claim that she wandered away, got lost or had to be sought by police. Although at times her record of her bank balances did not correspond with the bank's, there is no contention that she experienced difficulty in distinguishing between her money and that of others. As we have seen from quotation of testimony, she paid her accounts regularly. During her last year in the Mallory Hotel she lived alone and had to bathe herself, dress herself and go to the dining room alone. There is no con-

tention that she got into quarrels or misunderstandings. No one asserted that she was seen in her night clothes or presented an unkempt appearance.

The above completes our review of the testimony concerning these limited phases of the issue before us. The testimony which Jackson presented and which we reviewed in preceding paragraphs came in part from his own tongue, from his wife and others close to him. If this testimony reflects the truth, the decedent was the victim of advanced senility and was incapable of looking out for herself. If this testimony is accepted, Mrs. Detsch could scarcely feed herself, she could no longer dress herself and, unless constantly watched, wandered aimlessly in the streets or balanced precariously on window ledges. Her memory was gone and she was incapable of reasoning, if these witnesses were truthful. Likewise, if one accepts this testimony, Mrs. Detsch could not carry on a conversation or write in a coherent manner such a short message as can be scribbled on a postcard. The opposing testimony came for the most part from witnesses who seemingly were unidentified with any party to this case. Some of them, for instance, Dr. Ayers, Mr. Callahan and Miss Gaunt, lived in the same city as the appellant, San Francisco. Some who lived in Portland are responsible members of the medical and nursing professions. If these witnesses told the truth, Mrs. Detsch had preserved her faculties at least as well as most people of her years.

We were astonished when we read some of the evidence. For instance, we cannot understand how it was possible for one of the Sutter Hospital nurses to swear that Mrs. Detsch could not write a coherent message upon a postcard, when the truth is, she wrote a score of letters while in that hospital, some of which are

well composed. Likewise, we cannot understand how it was possible for the appellant, his wife and one of their fellow townsmen to testify that the decedent was incontinent of bladder and bowels in view of convincing evidence which came from impartial witnesses that she was free from that disability. Without lingering longer on these issues, we express our belief that the above-reviewed evidence which the appellant presented cannot be true. Not only do we think that it is false or that it greatly exaggerated some acts of the decedent, but we also believe that it reflects adversely upon the appellant's sincerity. The woman whom this evidence sought to picture as an incompetent, capable of uttering nothing but gibberish, was not a stranger to him—she was his mother. A litigant, in a case such as this, who disregards the hallowed precept, "Honor thy father and thy mother," places a stigma upon his suit which symbolizes a lack of merit.

We do not wish to be understood as holding that all of the testimony given by Jackson, Josephine, Mrs. Romaine and the others was false. We believe that Mrs. Detsch at times left the home without telling anyone that she was departing. But if letters in which she mentioned the reason for her unannounced departures may be considered, they were these: to mail a letter, to speak on the long distance telephone or to get relief from the constant watching to which she was subjected. We are prepared to believe that she frequently was impatient, intractable, and given over to quick sensibilities. Then, of course, she presented all of the problems of her advanced years, for she was well over the threshold of old age, and, like all old people, seemed like a flickering fire which is about to turn to ashes. Her unfortunate use of barbiturates

added to the troubles of arthritis and arteriosclerosis those that came from that source. Further, a woman of 83 years, who had lived for two score years in good hotels where her every whim had met with lackey-like gratification by liveried servants, would find it hard to adjust herself to a private home in which each occupant was expected to be his own servant. We are convinced that when Josephine brought her mother-in-law to her home, she brought there a difficult guest. But Mr. Pierce had warned her, and she had just accepted from her future guest a costly gift of diamonds. However, the real issue is not whether caring for this elderly woman was an arduous task, but whether she possessed testamentary capacity, and whether Jackson, in his treatment of her, adopted a course which she could reasonably construe as cruel.

Although the foregoing disposes of some of the issues, others remain. The questions confront us as to (1) whether or not Mrs. Detsch possessed testamentary capacity February 1, 1945, when she signed the amendatory instrument, (2) why she signed that paper, and (3) whether or not Arthur exerted any influence upon his mother to induce her to disinherit Jackson.

We have already considered much of the evidence which bears upon Mrs. Detsch's mentality. We will now proceed directly to the evidence which shows whether or not she possessed testamentary capacity February 1, 1945, when she amended the declaration of trust. Those who were present when she executed that instrument were Mrs. Katterman, Mr. Pierce and Mr. Keith Caldwell. The latter is a responsible member of the Oregon bar who became acquainted with Mrs. Detsch in May, 1944, when he drafted for her the will

which she executed June 14, 1944. At her request, he prepared for her the amendatory instrument.

In the early part of January, 1945, Mrs. Detsch, who was then in Good Samaritan Hospital, told Mr. Pierce that she wished to amend the declaration of trust in such a way that all of her estate would be given to Arthur. At that point Mr. Pierce conferred with Mr. Caldwell and presently the two called upon Mrs. Detsch. During the course of their visit to the decedent, she told them, according to Mr. Caldwell, that she "had been very badly misused" at Jackson's hands while she was in San Francisco. She told them that

"by virtue of that she didn't want her son Jackson or her daughter-in-law Josephine to have any of her money. And she said she felt her son Jackson had had a lot of money out of the family in previous years—her remark to me was this, in her very words: 'It is an awful thing to have to say, Mr. Caldwell, but my son killed a man and was tried for it and it took the entire family fortune to defend him, and after that, by virtue of it, Dad died.' And she said, 'My life has been sorrowed because I have had a great deal of trouble with Jackson's family, and I feel, due to the way he treated me and what he has had, I want Arthur to have everything I have.''

After Mrs. Detsch had recounted to Mr. Caldwell the stocks, bonds and cash that she possessed, Mr. Caldwell advised her and Mr. Pierce that, in order to carry out her wishes, she ought to amend the declaration of trust and execute a new will. In addition, so Mr. Caldwell swore,

"I suggested to Mr. Pierce that he have her write him a letter, telling him the things she wanted done and why."

After they had returned to their offices, Mr. Pierce wrote to Mrs. Detsch a letter, dated January 9, 1945, which said:

"If you will address a letter to me setting forth what disposition you wish made of the trust estate after your death, I will be very pleased to have the necessary amendment prepared and submitted to you for your approval and signature."

January 16, Mrs. Detsch wrote Mr. Pierce a letter which we have already mentioned. It said:

"I spoke to you about making a new will and as my son Jackson has received more money than his share and told me he was a rich man and did not want my money, and as I remember after the trial my husband was a broken man and said he was a poor man, as Jackson's trial cost him 40 to 50 thousand dollars. Besides the money he gave him to go West and almost one thousand to be put in the bank at Seattle and many thousands more, so I wish at my death all that I have left after paying my expenses I give to my son Arthur S. Detsch."

The letter also said:

"I also paid Jackson all expenses when I was with him and when I was with Arthur he asked nothing. * * * I will write of my experience in San Francisco at my son's home where I was staying during Sept. to Oct., 1944, and also my experience at Mrs. Romaine's where my son's wife confined me."

January 20, Mrs. Detsch wrote to Mr. Pierce the narrative of her experience in Jackson's and Mrs. Romaine's homes. The letter was long and the detailed recitals, as we said in a preceding paragraph, evidence a retentive memory.

Mr. Pierce, upon receipt of Mrs. Detsch's two letters, handed them to Mr. Caldwell, who presently prepared the amendatory instrument and a new will containing provisions in harmony with the amended declaration of trust. Shortly Mr. Caldwell and Mr. Pierce again called upon Mrs. Detsch. After she was shown the two instruments and they had been read to her, she stated that they were satisfactory and that she wished to execute them. The day this visit was made was February 1, 1945—more than three weeks after the first call of the two men. After Mrs. Detsch had expressed her desire to sign the two documents, she requested that Mrs. Katterman, the nurse who is mentioned in a preceding paragraph, be summoned as one of the attesting witnesses. Mrs. Katterman was sent for and thereupon she and Mr. Caldwell served as the attesting witnesses. Mr. Caldwell swore that Mrs. Detsch was familiar with the declaration of trust that she had signed five and one-half months previously and with the will she signed June 14, 1944. Likewise, he swore that she was well acquainted with the two documents he handed to her for signature February 1, 1945. Her mind was clear and she knew what she wanted to do, according to him. He testified that she possessed testamentary capacity.

As we have said, Mr. Pierce died before the trial. However, in a letter dated December 26, 1944, addressed to the appellant, Mr. Pierce said:

"We have never had word from any doctor in San Francisco that her condition was mental. We have, however, had letters from the doctors in Portland to the effect that she is mentally competent. I have talked to her since she returned to Portland and I do not doubt this statement at all. Personally, I think she is absolutely mentally competent."

Mrs. Katterman became acquainted with Mrs. Detsch two or three years previously when Mrs. Detsch was in Good Samaritan Hospital with a fractured hipbone. She swore that no thought of senility entered her mind when she was in Mrs. Detsch's presence. She said:

"I would consider she knew what she wanted and what she did not want."

She felt that Mrs. Detsch was mentally competent.

We have now accounted for all who were present February 1, 1945, when the amendatory instrument and its accompanying will were executed. No witness who testified in this case indicated that on February 1, 1945, or thereabouts, Mrs. Detsch lacked testamentary capacity.

It will be recalled that Mrs. Detsch told Mr. Caldwell and Mr. Pierce that Jackson was tried on a charge of murder. A copy of the indictment is one of the exhibits. It was returned by the Grand Inquest of the Commonwealth of Pennsylvania for the County of Philadelphia at the November session of 1907 and accused Jackson of the killing of one Harry Ferre. The evidence before us concerning the murder trial is scant, but indicates that Jackson defended himself by claiming that he shot Ferre under a belief that he was an intruder. Jackson swore that the murder trial lasted a week and that he was defended by two attorneys, each of whom was paid $2,000 by his father. He testified that detective fees and incidentals made the entire cost of the trial, which his parents bore, amount to no more than $4,500. He conceded that he received some additional sums from his parents, but claimed that all of the advances were deducted from his share of his father's estate. Arthur swore that when all of the expenses of Jackson's trial had been

defrayed he heard his father say that it cost him more than $40,000. We observe that in May, 1909, Josephine sued Jackson for a divorce. There is evidence that warrants a belief that this suit made further inroads upon the family fortune.

It is clear that Mrs. Detsch's plan to amend the declaration of trust and leave all of her property to Arthur originated in her mind when she was in the same city with Jackson and at least 700 miles from Arthur. It is likewise clear that she deliberated upon the plan and thought it over while she was a patient in Sutter Hospital. November 28, 1944, she wrote to Mr. Pierce:

"Arthur has always loved me very much and has caused me no trouble, but Jack very much. Although I also want to make a new will and as Jack in his trouble has taken all of Dad's fortune, but is now as he says a rich man and Arthur has lost a great deal."

On the same day she wrote a letter to Arthur which, among other matters, said:

"I wanted to make a new will and so leaving you what I have. Jack says he is a rich man so he don't need it."

December 5, 1944, she wrote a letter to Arthur which evidently was intended in part for Edna. It said:

"I want to make another will and have Arthur his rightful dues."

December 6 she wrote Arthur a letter which was addressed to "Dear Children", evidently meaning Arthur and Edna. It said:

"I wish to make a new will and give you what you deserve as Jack is rich and has had more than his share. I have written Mr. Pierce about it."

December 11 she wrote again to Mr. Pierce. The letter said in part:

"It has been only a little while since I wrote you about the jewelry that Josephine has. I want it returned to me. I leave Jack and his wife nothing and so do all in your power to get my jewelry."

It is seen from the above that the decedent did not execute the amendatory instrument without reflection, but as the result of a plan which formed in her mind at least two months before she carried it into execution In the meantime, she wrote letters about her intention and conferred about her plan with her attorney and the manager of her estate.

We are not going to recount herein at length the opinion evidence which bears upon Mrs. Detsch's testamentary capacity. The opinions of Mrs. Romaine, Mrs. Vilhauer and the appellant were adverse to the decedent's mentality. Opposed to that testimony was the evidence which we have already mentioned in part. No one present when the declaration of trust was signed, including Josephine, testified adversely to Mrs. Detsch's testamentary capacity. Likewise, no one present when she executed the amendatory instrument believed she lacked capacity; to the contrary, their testimony showed that she was legally capable of making a will. In addition to those witnesses, the record contains the opinions of many responsible persons that Mrs. Detsch possessed testamentary capacity. The additional witnesses were Mr. Robert M. Alton, vice-president and trust officer of the defendant bank, Mr. Albert J. Callahan, trust officer, Wells Fargo Bank & Union Trust Company of San Francisco, Mr. George H. Flanagan, manager, Mallory Hotel, Mrs. Ida L. Harmon, housekeeper, Mallory Hotel, Dr. Thomas F. Ayers, who attended Mrs. Detsch in Sutter Hospital, Dr. T.

Homer Coffin, who treated Mrs. Detsch July 11, 1945, to February 25, 1946, Dr. H. H. Dixon, who attended the decedent from March 30, 1946 to the time of her death, Miss Lillian H. Parsons, the secretary, Miss Caroline Higley, the nurse who attended Mrs. Detsch for approximately two months before she went to Jackson's home, and Miss Jessie Gaunt, one of the nurses who cared for the decedent in Sutter Hospital and who accompanied her in the plane to Portland.

We will give a little more attention to Dr. Dixon's testimony. Mrs. Detsch came to him March 30, 1946, and he thereupon made an examination of her. Since nothing said by Dr. Dixon is material to our inquiry except his patient's mental capacity, we will mention only the parts of his testimony which deal with that subject. He swore that when Mrs. Detsch came to him she was tense, moody, sleepless and suffering from the over-use of sedatives. He thought that she, like other people of her years, displayed some senility. After his treatment won her away from barbital, her restlessness disappeared. In describing her mental qualities, he commented as follows:

"The recent memory was exceedingly good. * * * I felt she had a very good grasp of all the details she was handling. I do not feel there was marked impairment of judgment. * * * She was very alert. * * * She had no marked loss of memory. * * * From the standpoint of objective examination of this woman, I could see nothing that would indicate a failing ability to exercise judgment, especially in regard to finances because she wanted to know where every penny was placed and every detail."

We quote further from him:

"Q. Could you state whether or not she had any hallucinations?

"A. I never had any indication of any hallucinatory happening in this case.

"Q. Could you state whether or not she had any delusions?

"A. Delusions is defined as false beliefs, and I felt none.

\* \* \*

"Q. Did you form an opinion which would enable you to say Mrs. Detsch was competent to understand the terms of and to execute a trust agreement whereby she turned over her property to a bank to manage for her?

"A. I felt she had a very good grasp of all the details she was handling, yes.

"Q. Would you state, in your opinion, whether or not she was competent mentally to have made and executed a Last Will and Testament?

"A. It is my opinion she was competent."

It is important to add that Dr. Dixon was called to the witness stand by the appellant.

Notwithstanding the testimony just quoted, which came from a highly competent source, the appellant argues that his mother was the victim of delusions and hallucinations, and that, therefore, her possession in general of testamentary capacity was unimportant. If the decedent was, in fact, the victim of a monomania which deceived her into a belief that Jackson had mistreated her, one would think that she would always refer to him in hateful terms whenever she mentioned him, and never in words of endearment. But the witnesses upon whom the appellant depended to prove that his mother turned against him and disinherited him because of the purported delusion swore that she was very fond of him and repeatedly referred to him

as her favorite son. For instance, Mrs. Romaine testified:

"She always liked her son Jackson; he was her favorite son.

"Q. Did she talk to you on the subject?
"A. Well, when I would say—

"Q. No. Just answer that question, please, 'yes' or 'no'.
"A. Yes.

"Q. Did she talk to you more than once on that subject?
"A. Oh, yes, every day. She would always bring up something about him.

"Q. Can you tell us what she would say in that regard?
"A. One thing would be, 'We will see Jackson some day, maybe today. Maybe he won't come down today, and if he doesn't, then I can phone him.'

"Q. Did she ever express to you her opinion of her son, A. Jackson Detsch?
"A. Well, only that he was her favorite son. She would always bring that in. It was always 'her son'—if it wasn't for her son she wouldn't keep going in health and life; if it wasn't for her son she wouldn't be here.

\* \* \*

"A. She said, 'Jackson is the one who is my favorite son; Jackson is the one why I am here.'

"Q. That is what I meant.
"A. 'And he takes care of my finances' and like that. She was always worrying about finances. But when I would bring it up that Jackson was taking care of her, then she was always all right after that."

That testimony, which came from a witness upon whom the appellant depended much to establish his case,

collides head on with his contentions that his mother was the victim of the purported delusions.

Mrs. Vilhauer, the Sutter Hospital nurse, swore that when Mrs. Detsch mentioned her sons she referred to Jackson as "the local boy." According to her, the latter was her favorite and she was "quite proud" of him. The following is taken from her examination:

"Q. You say she expressed deep feeling towards the local boy down there?

"A. Yes, sir.

"Q. Did she tell you what his name was?

"A. Well, I think she called him Jack.

"Q. That is right. And she thought a great deal of him?

"A. Yes, sir.

"Q. Talk about him repeatedly?

"A. Yes, when he mailed her cards from down South she was always gleeful and had me read them.

"Q. And they came frequently, didn't they?

"A. Yes, they did."

The cards to which the witness referred were postcards. Jackson's occasion for mailing them "from down South" was the fact that he was in Los Angeles part of the time while his mother was in Sutter Hospital. Although this witness indicated in the above-quoted language that Mrs. Detsch was pleased with the postcards, Jackson, as a witness, admitted that he received no letters or messages from his mother while she was in Sutter Hospital. It will be recalled that she wrote almost a score of letters to Arthur in that period and some to Mr. Pierce. In fact, in that period she wrote to Mr. Pierce that she wished to remake her will and leave Jackson nothing.

The testimony of Mrs. Vilhauer, like that of Mrs. Romaine, refutes the contention that Mrs. Detsch was the victim of a delusion which poisoned her mind into a belief that Jackson had mistreated and imprisoned her. Notwithstanding the testimony of those witnesses, it is certain that in the very period with which their testimony was concerned, the mother was sorely displeased with Jackson and felt that he had mistreated her. Her affection for him had vanished and the bitterness of her feeling ran so deep that it rekindled her recollection of his murder trial and of disagreeable incidents associated with it. Despite the quoted words of those two witnesses, we have the testimony of the appellant himself and a statement in his brief which speaks of his mother's ''transition from love to hatred.'' We bestowed the foregoing attention upon this phase of the evidence because it shows once more that the appellant, in his efforts to sustain his charges, presented testimony which, obviously, is without merit. The falsity of this particular testimony has been demonstrated.

We are satisfied that Mrs. Detsch did not suffer from any mental ailment, but that her illness was of the nervous system. We are convinced that on September 15, 1944, and February 1, 1945, she possessed testamentary capacity. We do not believe that she suffered from any delusions or hallucinations. Although we are certain that her affection for the appellant changed to one of deep disappointment and displeasure, we do not think that the transition was due to any mental derangement upon her part, but to the fact that the treatment she received while in his home met with her condemnation. We do not think that her condemnation of it to the extent of disinheriting him shows a deranged mind.

When she entered his home her hourglass was running low. Not many grains of sand remained for her, but she wished to possess happiness as long as they lasted. She was preparing to meet her Maker, and had made it clear to Jackson that she wanted to spend her remaining days in peace and amid agreeable surroundings. Preceding paragraphs set forth the treatment she actually encountered. The visit got off to a very poor start. It was preceded by solicitations made by Jackson for a copy of her will, followed shortly by a demand for a power of attorney. Then came demands for other papers and documents. Plainly, the would-be host was thinking of himself and not of his intended guest, even though she was his mother. In that inauspicious manner, the visit was commenced. Hardly had it begun than dark clouds loomed upon the horizon and got darker, for, on the morning of the third day, the mother sent Arthur the telegram which said that Jackson had demanded a power of attorney. A few hours later Jackson inaugurated his routine which treated the mother as an incompetent. Evidently the succeeding days were deemed by the decedent as the most unhappy of her long life.

■ When the mother got away from Jackson and Mrs. Romaine she commenced a period of reflection. She appraised Jackson's life and the part that Josephine had played in it. When she brought the full panorama before her vision, she contrasted it with the devotion of her ever faithful son, Arthur. The result was that two months later she made the amendment of February 1, 1945. We do not believe that she was prompted by hatred for Jackson when she signed the instrument, but by a desire to reward constant affection and show her appreciation of Arthur's never failing

kindness. The letters he wrote to Jackson, as well as those he wrote to his mother, show that he was a man of character and of fine discernment. We were startled when we encountered in one of Jackson's letters the following:

> "One of the reasons I write letters and one of the reasons I make notes is so they may be referred to at some future time unqualifiedly."

He even told Arthur not to use the telephone, but to make his communications in letters so that a record would be made of the matter. We cannot say that when the appellant's elderly mother appraised as cruel and unwarranted the treatment he had accorded her, she thereby gave evidence of mental infirmity. It appears to us that he afforded her an adequate premise for her conclusion. Thus she had a sound basis for changing the purpose to which she had held for a score of years—that of dividing her estate equally between the two sons. The last years, in fact, the last days, of one's life are sometimes the most important. Not infrequently they determine to whom the savings of the lifetime will be bequeathed, for often it is true that wills are written while life is turning to ashes.

There remains the question as to whether or not Arthur exerted any undue influence upon his mother and thereby induced her to execute the amendatory instrument. We are satisfied that his influence was a powerful one—It was the influence that is exerted by a life well lived. But when his mother deliberated upon her new plan for distributing her bounty, she was seven hundred miles away from him and in the immediate vicinity of Jackson. The evidence warrants a belief that when the decedent signed the new will and the amendatory instrument Arthur knew in general of her

intention, but not of the day or means which she had selected. He had not spoken to her about her estate or will. We do not think that secrecy was invoked when the two instruments were signed. But the appellant argues that Arthur should have told him of what took place February 1, 1945, so that he could thereupon have dissuaded his mother of her impressions of him. In the first place, if her belief that he had mistreated her was the result of a delusion or hallucination—which we do not believe—no amount of argument would have changed her mind. In the second place, it was not necessary for Arthur to have told his brother that he had lost his mother's affection. Jackson was well aware of that fact. His letters to her, with rare exceptions, remained unanswered, and shortly after his mother signed the amendatory instrument she told him on the telephone that he was not her son.

With full knowledge that he had forfeited his mother's affection, the appellant, with stoic resignation to his fate, made no effort to regain her faith in him until three days before her death, but then it was too late; approaching death had robbed her of her power of speech. He cannot complain that Arthur should have told him of what took place in his own home in September of 1944; he knew that even better than Arthur. And if he thinks that he lost his mother's affection because she was at times irascible, it may be that he himself is not free from that fault. Attributes of personality are frequently inherited, sometimes in accentuated form.

We have considered carefully all contentions advanced by the appellant. Every piece of evidence and all of the briefs have been read and studied. We gave the case unusual attention because the circumstances

are bizarre. The above constitutes our conclusions. We have not reviewed herein the authorities because it appears to us that the legal principles which govern this case are simple. We know of no reason for setting forth herein an analysis of the many decisions cited in the appellant's brief. We know of no other case similar in its facts to this one.

The decree of the Circuit Court is affirmed.